859 A.2d 1261

**TRIBUNE–REVIEW PUBLISHING COMPANY and WPXI, Appellant,**

v.

**DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT, Appellee.**

Supreme Court of Pennsylvania.

Re–Submitted Sept. 27, 2004.

Decided Oct. 21, 2004.

David Alan Strassburger, Esq., Attorney H. Yale Gutnick, Pittsburgh, for Tribune–Review Publishing Company, et al.

Teri L. Henning, Esq., for amicus curiae Pennsylvania Newspaper Association.

Nancy J. Kippenhan, Esq., Leslie Anne Miller, Esq., for Department of Community and Economic Development.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice NEWMAN.

Tribune–Review Publishing Company and WPXI (collectively, Tribune–Review) appeal from an Order of the Commonwealth Court, which, after an interlocutory appeal and remand, affirmed the decision of the Department of Community and Economic Development (DCED) to deny Tribune–Review access to unfunded Community Revitalization Program (Program) grant applications. For the reasons that follow, we affirm the Order of the Commonwealth Court.

## FACTS AND PROCEDURAL HISTORY

DCED is a Commonwealth agency that, *inter alia*, distributes state-funded grants pursuant to the Program, which is designed to assist local communities in financing revitalization and improvement projects.[1] By letter dated June 9, 1999, Tribune–Review requested an electronic copy of DCED's Single Application Comprehensive Tracking Report computer

[1] 12 Pa.Code § 123.3(b) sets forth the requirements for projects seeking Program funding:

(1) [Community Revitalization Program] funds may be used for community revitalization and improvement projects that are consistent with Act 7A of 2002. Eligible projects include projects which meet one or more of the following criteria:
(i) Improve the stability of the community.
(ii) Promote economic development.
(iii) Improve existing or develop new, or both, civic, cultural, recreational, industrial and other facilities.
(iv) Assist in business retention, expansion, creation or attraction.
(v) Promote the creation of jobs and employment opportunities.
(vi) Enhance the health, welfare and quality of life of Pennsylvania citizens.
(2) Projects for the sole benefit of a for-profit entity are not eligible for program funding.

database (commonly referred to as "the log") for all Program grant applications for fiscal years 1996–97, 1997–98, and 1998–99. Specifically, Tribune–Review sought to review the following information: (1) the application sequence number; (2) the date the application was received by DCED; (3) the applicant name and contact person; (4) the project description; (5) the project location; (6) the amount of funding requested; (7) any notations as to whether the application was complete and consistent with Program guidelines; (8) whether or not DCED had approved the application; (9) where applicable, the amount of the grant awarded; and (10) where applicable, the date on which DCED notified the applicant that it had approved the application.

DCED responded by letter dated June 15, 1999, indicating that it was undertaking a review of the request by Tribune–Review and would, upon completion of its assessment, provide Tribune–Review with those materials satisfying the request that it deemed public information. On June 30, 1999, DCED provided Tribune–Review with information for only those Program applications that DCED had granted and that had been reduced to contract. Tribune–Review renewed its request on August 10, 1999, explicitly seeking information related to grant applications that DCED denied. DCED denied the request, maintaining that grant applications not reduced to contract were not public records subject to disclosure pursuant to the Right to Know Act (Act), Act of June 21, 1957, P.L. 390, *as amended,* 65 P.S. §§ 66.1—66.4. Section 1(2) of the Act defines a "public record" as follows:

Any account, voucher or contract dealing with the receipt or disbursement of funds by an agency or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons: Provided, That the term "public records" shall not mean any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the

performance of its official duties, except those reports filed by agencies pertaining to safety and health in industrial plants; it shall not include any record, document, material, exhibit, pleading, report, memorandum or other paper, access to or the publication of which is prohibited, restricted or forbidden by statute law or order or decree of court, or which would operate to the prejudice or impairment of a person's reputation or personal security, or which would result in the loss by the Commonwealth or any of its political subdivisions or commissions or State or municipal authorities of Federal funds, excepting therefrom however the record of any conviction for any criminal act.

65 P.S. § 66.1(2).

Tribune–Review appealed the decision of the DCED by filing a Petition for Review in the Commonwealth Court. In the Petition, Tribune–Review maintained that applications for state-funded grants are essential components of DCED's decision to distribute funds and, therefore, are public records, whether or not DCED ultimately grants the applications. In a published Opinion, the Commonwealth Court agreed, concluding that all applications for Program funding are essential components of DCED's decision as to which applicants receive money from the Commonwealth; accordingly, the Commonwealth Court determined that the grant applications, regardless of disposition, were public records. *Tribune–Review Publishing Company v. Department of Community and Economic Development*, 751 A.2d 689 (Pa.Cmwlth.2000) (*Tribune–Review I*).

The Commonwealth Court explained that "the purpose of the Act is to scrutinize the acts of public officials and to make them accountable for their use of public funds." *Id.* at 692. The court specifically relied on the fact that DCED "represented that it relies upon recommendations from legislators, as opposed to a competitive process, as the basis for determining which grant applications are to be awarded funds." *Id.* at 692–93. Finding the potential for abuse and political favoritism, the Commonwealth Court reasoned that "[i]f the public were not entitled to review the unfunded as well as the funded

grant applications, quite conceivably a community could be continually denied Program funds while another community, with perhaps a more aggressive or persuasive representative, could be repeatedly awarded funds." *Id.* at 693. Because the process "appears to fly in the face of the purpose of the Act[,]" the Commonwealth Court required disclosure. *Id.*

DCED filed a Petition for Allowance of Appeal with this Court, contending that the Commonwealth Court had misconstrued the provisions of the Act. However, before we disposed of the Petition, we decided *LaValle v. Office of General Counsel*, 564 Pa. 482, 769 A.2d 449 (2001). In *LaValle*, a group of state senators sought disclosure of a report prepared by Ernst & Young for the Department of Transportation (PennDOT) to determine the extent of damages incurred by Envirotest Partners (Envirotest) when PennDOT abandoned a large-scale, centralized automotive emissions testing program that PennDOT had contracted with Envirotest to administer. Based on this report, PennDOT settled with Envirotest, out of court, for $145 million. The state senators contended that the report constituted a public record because it formed the basis for the legislature's expenditure of public funds for the settlement. We rejected the senators' request, affirming the rationale employed by the Commonwealth Court that the report constituted protected work product, which would include "mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics." *Id.* at 457. We "decline[d] to infer that by prescribing a right of public access to minutes, orders, decisions, accounts, vouchers and contracts, the General Assembly meant to expose predecisional, internal deliberative aspects of agency decision making to mandatory public scrutiny." *Id.* at 458.

Following the *LaValle* decision, we entered the following Per Curiam Order in the instant matter:

AND NOW, this 8th day of March, 2002, the petition for allowance of appeal is hereby granted. The order of the Commonwealth Court is vacated and the matter is remand-

ed for reconsideration in light of *LaValle v. Office of General Counsel*, 564 Pa. 482, 769 A.2d 449 (2001).

*Tribune–Review Publishing Company v. Department of Community and Economic Development*, 568 Pa. 36, 791 A.2d 1153 (2002) (*Tribune–Review II*) (Per Curiam Order) (internal citation modified).

On remand, the Commonwealth Court reversed its previous position and affirmed the decision of DCED to deny the request of Tribune–Review for access to the unfunded grant applications, finding that they were not public records. *Tribune–Review Publishing Company v. Department of Community and.Economic Development*, 814 A.2d 1261 (Pa.Cmwlth. 2003) (*Tribune–Review III*). The Commonwealth Court adopted the "deliberative process privilege," which it described as follows:

> The deliberative process privilege protects from disclosure documents containing confidential deliberations of law or policymaking, reflecting opinions, recommendations, or advice. The privilege tempers the rights of citizens to access public records. The privilege allows for an intra-agency and inter-agency flow of information. The privilege protects from disclosure the discretion afforded to and exercised by agencies. The deliberative process privilege applies to predecisional communications, which reflect on legal or policy matters.

*Id.* at 1263–1264 (internal quotation and citations omitted). The court determined that the deliberative process privilege protected unfunded grant applications from disclosure; "[o]nce the applications are acted upon, *i.e.* granted, the applications are public records subject to disclosure." *Id.* at 1264.[2] Senior Judge Jiuliante dissented without filing an opinion.

**2.** This Court has twice previously addressed the deliberative process privilege, but we never adopted it. *See LaValle*, 769 A.2d at 457 ("[t]his Court has not definitively adopted the deliberative process privilege ... and it is beyond the scope of the present opinion to do so"); *Commonwealth ex rel. Unified Judicial System v. Vartan*, 557 Pa. 390, 733 A.2d 1258 (1999) (plurality Opinion).

Tribune–Review filed a Petition for Allowance of Appeal, contending that: (1) the Commonwealth Court misconstrued our Grant, Vacate, and Remand Order (GVR Order); and (2) the Commonwealth Court improperly adopted and applied the deliberative process privilege. We granted allocatur on both issues, in hopes of both explaining the meaning of a GVR Order and clarifying what constitutes a public record within the ambit of the Right to Know Act.

## DISCUSSION

The first issue in this case is jurisprudential in nature and concerns the situation where, in response to a Petition for Allowance of Appeal, we grant the Petition, vacate the Order of the intermediate appellate court, and remand the matter for that court to consider a statute, case law, or some other fact or circumstance. In the present matter, we entered such an Order, and Tribune–Review posits that the Commonwealth Court improperly concluded from the Order that we were directing the Commonwealth Court to reverse its earlier position.

The exact use and import of a GVR Order became the subject of some debate in the United States Supreme Court in the last decade. In the cases of *Stutson v. United States*, 516 U.S. 193, 116 S.Ct. 600, 133 L.Ed.2d 571 (1996), and *Lawrence on Behalf of Lawrence v. Chater*, 516 U.S. 163, 116 S.Ct. 604, 133 L.Ed.2d 545 (1996), the Supreme Court entered Per Curiam GVR Orders, and the majority took great pains to justify their use:

> In an appropriate case, a GVR order conserves the scarce resources of this Court that might otherwise be expended on plenary consideration, assists the court below by flagging a particular issue that it does not appear to have fully considered, assists this court by procuring the benefit of the lower court's insight before we rule on the merits, and alleviates the potential for unequal treatment that is inherent in our inability to grant plenary review of all pending cases raising similar issues. Where intervening develop-

ments, or recent developments that we have reason to believe the court below did not fully consider, reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome of the litigation, a GVR order is, we believe, potentially appropriate.... Used in accordance with this approach, the GVR order can improve the fairness and judicial accuracy of judicial outcomes while at the same time serving as a cautious and deferential alternative to summary reversal in cases whose precedential significance does not merit our plenary review.

*Lawrence*, 516 U.S. at 167–68, 116 S.Ct. 604 (internal citations and quotations omitted). As the Court explained in *Stutson*, "a GVR order both promotes fairness and respects the dignity of the Court of Appeals by enabling it to consider potentially relevant decisions and arguments that were not previously before it." *Stutson*, 516 U.S. at 197, 116 S.Ct. 600. Justice Scalia, joined by Justice Thomas and joined separately in part by Chief Justice Rehnquist, filed a Dissenting Opinion, in which he argued that the use of a GVR Order has been and should continue to be limited to situations where: (1) "an intervening factor has arisen that has a legal bearing upon the decision;" (2) "clarification of the opinion below is needed to assure our jurisdiction;" and (3) the party not seeking discretionary review "confesses error in the judgment below." *Stutson*, 516 U.S. at 191–92, 116 S.Ct. 611 (Scalia, J., dissenting).

Similar to the U.S. Supreme Court, we employ GVR Orders to manage our discretionary docket when there are intervening developments or other circumstances that the intermediate appellate court appears not to have considered. In addition to GVR Orders, we regularly utilize other docket management tools, such as a Per Curiam Reversal, to indicate that we believe, in light of some new or recent development, that the decision of the Commonwealth or Superior Court cannot stand.[3] *See, e.g., Pennsylvania State Police v. Grogan*, 577

---

3. We refer specifically to Orders of the Superior Court and Commonwealth Court because we are currently discussing our discretionary

Pa. 230, 843 A.2d 1223 (2004); *Commonwealth v. Ceo*, 577 Pa. 316, 845 A.2d 199 (2004); *Commonwealth v. Marsh*, 576 Pa. 613, 840 A.2d 988 (2003); *Silver v. Medhkour*, 573 Pa. 67, 821 A.2d 584 (2003); *Commonwealth v. Davis*, 570 Pa. 488, 810 A.2d 634 (2002); *Wood v. Commonwealth, Department of Transportation, Bureau of Driver Licensing*, 568 Pa. 599, 798 A.2d 1276 (2002); *Commonwealth v. Rivera*, 566 Pa. 620, 783 A.2d 765 (2001); *Commonwealth v. Paster*, 566 Pa. 615, 783 A.2d 763 (2001); *Commonwealth v. Love*, 565 Pa. 470, 776 A.2d 937 (2001); *Wolfgang v. City of Pittsburgh*, 563 Pa. 188, 758 A.2d 1178 (2000).[4] In practice, when this Court issues a Per Curiam Order reversing the intermediate appellate court, we state explicitly the basis for our determination, usually an intervening ruling of our Court on point. Thus, were we to adopt Justice Scalia's view of the effect of a GVR Order, we would render the dichotomy between a Per Curiam Reversal and a GVR Order specious.

 Unlike a Per Curiam Reversal, which explains to the bench and bar that the Order of the Superior Court or Commonwealth Court is erroneous, a GVR Order simply indicates that there is something we believe that the intermediate appellate court did not consider, which we would like it to review. Whether the purpose is to give the intermediate court the opportunity to ensure the accuracy and consistency of judicial outcomes in cases where our discretionary review is not warranted or to ask the intermediate appellate court to review an issue, usually created by intervening circumstances, in a matter that we believe may merit our review, a GVR Order is not a direction to the intermediate appellate court that it must go in the opposite direction. Instead, a GVR Order is simply a request from this Court that the Commonwealth Court or Superior Court reconsider the case.

 In the present matter, the Commonwealth Court erroneously believed that we had reversed its decision, rather than

docket. We do recognize that these docket management tools have some application in matters where our jurisdiction is mandatory.

4. The U.S. Supreme Court does use Per Curiam Reversals, albeit with much less frequency.

vacating it, as we did. Were we to reverse an Order of the Commonwealth Court, it would indicate that the Order, and the Opinion usually accompanying it, was incorrect. When we vacate an Order, we are not expressing any position on the accuracy of the Order (or Opinion). It is conceivable that, after remand of a vacated Order, the Commonwealth Court could have issued an Order and Opinion substantially similar to the one originally entered, provided that the court discussed the intervening circumstance that we asked be considered. Despite its belief that we had reversed, the Commonwealth Court in the case *sub judice* did perform the analysis we requested, rendering this matter ripe for review on the merits.

The substantive issue here concerns whether unfunded Program grant applications are "public records" within the ambit of Section 1(2) of the Act. That section provides in relevant part that a "public record" is "[a]ny account, voucher or contract dealing with the receipt or disbursement of funds by an agency . . . and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons. . . ." 65 P.S. § 66.1(2). The Act requires public access for "examination and inspection" only of decisional documents and writings that accompany or memorialize funding. *See* 65 P.S. § 66.2. Therefore, the inquiry becomes whether "the log" falls within either of these categories.

Neither "the log" nor the information it contains could be characterized fairly as an account, contract, or voucher to accompany or memorialize funding. Likewise, "the log" is not a minute, order, or decision of DCED that fixes any rights, privileges, immunities, duties, or obligations. While the database does indicate whether certain applications have been awarded Program funding, it is simply an electronic storage facility, and not a decisional document. Moreover, we have recently confirmed that the Act is designed to require disclosure only of documents prepared by the government agency or at the express direction of the government agency. *See Tribune–Review Publishing Company v. Westmoreland County Housing Authority*, 574 Pa. 661, 833 A.2d 112 (2003).

"The log" is compiled by DCED, but it is merely a collation of data provided by Program applicants. Whereas the Act allows the public to review agency documents, it does not permit public consumption of documents created by private entities, unless done at the express direction of the agency. Consequently, a database that is simply an assemblage of information provided by applicants cannot be deemed a public record simply because the agency undertakes the secretarial task of inputting data.[5]

The Commonwealth Court used this case as an opportunity to adopt the deliberative process privilege, which we described in *Commonwealth ex rel. Unified Judicial System v. Vartan,* 557 Pa. 390, 733 A.2d 1258 (1999) (plurality Opinion), as follows:

> The deliberative process privilege permits the government to withhold documents containing confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice.... The privilege recognizes that if governmental agencies were forced to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer.

> \* \* \*

■ For the deliberative process privilege to apply, certain requirements must be met. First, the communication must have been made before the deliberative process was completed. Secondly, the communication must be deliberative in character. It must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters. Information that is

5. We recognize that there are apparently columns in "the log" that indicate whether funding has been awarded, the amount of that funding, and the date on which the award was made. However, this information, by itself, would not aid Tribune–Review in its ultimate goal of analyzing the decision-making process of DCED, and the entries in the database are not contracts and are not what fix the rights, duties, or responsibilities of the entities awarded Program grants (or denied same).

purely factual, even if decision-makers used it in their deliberations is usually not protected.

*Vartan*, 733 A.2d at 1263–1264 (internal quotations and citations omitted). However, rather than adopting this "privilege," we simply note that documents conforming to the above description are not public records subject to disclosure pursuant to the Act. Therefore, the deliberative process privilege is effectively unnecessary as any communication made prior to the completion of deliberation cannot be a contract, account, or voucher dealing with the receipt or disbursement of funds and cannot be a decisional document that would fix the rights, privileges, immunities, duties, or obligations of any of the entities involved. Accordingly, while we agree with the principles we articulated in *Vartan*, adoption of the deliberative process privilege would be superfluous in light of our construction of the definition of the phrase "public record."

## CONCLUSION

For the foregoing reasons, we affirm the Order of the Commonwealth Court insofar as it refused to grant Tribune–Review access to "the log" or any other information concerning applications that did not receive Program funding.

Justice SAYLOR files a dissenting opinion in which Justice CASTILLE and NIGRO join.

Justice SAYLOR, dissenting.

I respectfully dissent, for the reasons articulated in the Commonwealth Court's initial decision in this matter, authored by Senior Judge Jiuliante. *See Tribune–Review Pub. Co. v. DCED*, 751 A.2d 689 (Pa.Cmwlth.2000). In summary, the unfunded grant applications under review bear a sufficiently close nexus to the Department's decision-making (which entails either rejecting them, or, apparently, deciding not to review them at all) to fall within the Right to Know Act's definition of public records, *see* 65 P.S. § 66.1(2). *See generally North Hills News Record v. McCandless*, 555 Pa. 51, 55–58, 722 A.2d 1037, 1039–40 (1999) (holding, based on a long line of

decisions originating in the Commonwealth Court, that documents are "public records" under the Act where they bear a close relationship to an actual agency decision). Moreover, to permit the Department's explanation that its decisions are predicated upon recommendations from legislators, as opposed to any competitive review process, to control the public's right to access would subvert the Act's salutary purposes. *See id.* at 692–94.

I also differ with the majority's interpretation of *Tribune–Review Publishing Co. v. Westmoreland County Housing Auth.*, 574 Pa. 661, 833 A.2d 112 (2003), as confirming that the Right to Know Act requires disclosure only of documents prepared by, or at the express direction, of a government agency. *See* Majority Opinion, *slip op.* at 11. To the contrary, such decision makes clear that the statutory definition of a public record "applies to a wide range of documents that contain information relating to the disbursement of public funds or an action of an agency that fixes the rights or obligations of individuals." *Id.* at 668–69, 833 A.2d at 116; *accord LaValle v. Office of General Counsel*, 564 Pa. 482, 493–94, 769 A.2d 449, 456 (2001) (explaining that the Right to Know Act requires disclosure of minutes, orders, decisions, accounts, vouchers, and contracts, and documents bearing a sufficiently close nexus to such statutory categories).

Finally, I believe that the Tribune–Review's request for information from the Department's database derived from those applications represents a reasonable approach to production of the relevant information, while avoiding the cumbersome process of parsing through each application to evaluate whether, and to what extent, it may contain additional information exempted from disclosure. *Accord Tribune–Review*, 751 A.2d at 693 (observing that "the Department cannot be forced to compile a list of unsuccessful grant applications; however, it can be compelled to provide information sufficient to allow the Tribune to compile its own list").

Justice CASTILLE and Justice NIGRO join this dissenting opinion.