127 A.3d 745

VERIZON PENNSYLVANIA, INC., Appellant

v.

COMMONWEALTH of Pennsylvania, Appellee.

Verizon Pennsylvania, Inc., Cross Appellee

v.

Commonwealth of Pennsylvania, Cross Appellant.

Supreme Court of Pennsylvania.

Argued March 10, 2015.

Decided Nov. 18, 2015.

Charles Edward Thomas III, Esq., Thomas, Long, Niesen & Kennard, for Pennsylvania Telephone Association, Amicus Curiae.

John Bartley Delone, Esq., Carol L. Weitzel, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

Craig B. Fields, Esq., R. Gregory Roberts, Esq., Morrison & Foerster, LLP, Jeffrey S. Stokes, Esq., Keefer Wood Allen & Rahal, L.L.P., Harrisburg, for Verizon Pennsylvania, Inc.

SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.

## *OPINION*

Justice TODD.

In these cross-appeals by Verizon Telephone Company of Pennsylvania ("Verizon") and the Commonwealth of Pennsylvania ("Commonwealth"), we consider the taxability, under Pennsylvania's Gross Receipts Tax, 72 P.S. § 8101(a)(2), of Verizon's gross receipts from: (1) the installation of private phone lines; (2) the provision of directory assistance services; and (3) certain non-recurring charges levied on its customers for the installation of telephone lines; moves of, and changes to telephone lines and services; and from repairs of telephone lines. After careful consideration, we conclude that revenue derived from all such activities constitutes gross receipts taxable under 72 P.S. § 8101(a)(2), and, thus, we affirm the portion of the order of the Commonwealth Court which determined revenue from the first two above-enumerated activities was taxable, and reverse the portion of the Commonwealth Court's order finding revenue from the third activity was not.

## I. Background

We begin by briefly recounting the history of the Gross Receipts Tax in Pennsylvania, inasmuch as the evolution and meaning of its language through the years is the central focus of the parties' current dispute. The Pennsylvania General Assembly first enacted this tax in 1866 in order to pay our

state's share of the debt incurred by the United States as the result of the Civil War. Stradley and Krekstein, *Corporate Taxation and Procedure in Pennsylvania* § 356 (1942). This tax was initially applied only to the gross annual receipts of railroad, canal, and transportation companies which were incorporated in Pennsylvania and which did not pay income taxes. However, gradually, as the industrialization of our Commonwealth progressed, the scope of the tax was expanded by the legislature, such that, by the late 1870's, it included companies which received extensive revenue from the utilization of emerging technologies, including, *inter alia,* steamboat, streetcar, telegraph, and pipeline corporations. *See* Act of June 7, 1879, P.L. 112, Section 7.

In 1889, our legislature again widened the scope of the Gross Receipts Tax, through the passage of the Act of June 1, 1889, P.L. 420 (codified at 72 P.S. § 2181 (1889) (repealed)), which was the genesis of the taxing statute at issue in this appeal. Relevant to the matter at hand, Section 23 of that law included among the enumerated business entities required to pay this tax all telephone companies doing business in Pennsylvania, whether incorporated in Pennsylvania or elsewhere.[1]

1. National Bell Telephone Company—founded in 1877 by its namesake and the original patent holder for the telephone, Alexander Graham Bell—had been in existence at that time for only a little over a decade, but it underwent rapid growth and expansion of its customer base thereafter, so that, by 1889, it had a national network of wholly owned subsidiary corporations responsible for building and maintaining the physical infrastructure of "local" phone networks, i.e., the networks situated within individual cities and states. These local networks transmitted phone messages between subscribers to the network and provided the equipment for customers to send and receive such messages in their homes and businesses. (In Pennsylvania, National Bell's subsidiary was incorporated in 1879 and originally known as the Bell Telephone Company of Philadelphia, which was later changed in 1907 to Bell Telephone of Pennsylvania, a corporate predecessor of Bell Atlantic–Pennsylvania, which, in turn, became Verizon Pennsylvania. *See* (Verizon Bell Atlantic Corporation, Corporate History, available at *http://transition.fcc.gov/wcb/armis/carrier_filing_history/COSA_History/ bntr.htm*)). National Bell, through a separate subsidiary, American Telephone and Telegraph ("AT & T"), built and operated long distance lines for transmission of interstate phone messages and sold long distance phone service to customers separately from the local phone services offered by its other subsidiaries. John Brooks, *Telephone: The First Hundred Years* (1976); Harvard Business School Historical Collec-

This law provided that telephone companies were required to pay a specified tax rate on each dollar of their gross receipts "from ... telephone ... *business* done wholly within" Pennsylvania. 72 P.S. § 2181 (1889) (repealed) (emphasis added).

Subsequently, in 1925, through the enactment of the Act of May 14, 1925, P.L. 706, the legislature amended former Section 2181 so that telephone companies paid the gross receipts tax on each dollar of their receipts "from ... telephone[ ] *traffic* ... done wholly within" Pennsylvania. 72 P.S. § 2181 (1925) (repealed) (emphasis added). In 1929, the General Assembly passed the Act of April 25, P.L. 662, which again changed the means of taxation for gross receipts of telephone companies by providing that this tax would be assessed on each dollar of gross receipts of the companies "from ... *telephone messages transmitted* wholly within" Pennsylvania. 72 P.S. § 2181 (1929) (repealed) (emphasis added).

This method of calculation of the gross receipts tax for telephone companies, i.e., based on "telephone messages transmitted," has remained unchanged since the 1929 amendments. In 1971, the General Assembly repealed 72 P.S. § 2181, but simultaneously reenacted all of its provisions, with minor stylistic language modifications and adjustment of the tax rate, in the Tax Reform Act of 1971—the Act of March 4, 1971, P.L. 6 (codified at 72 P.S. § 8101 (1971–2000)). Just as 72 P.S. § 2181 had specified for the preceding 42 years, 72 P.S. § 8101 required that the gross receipts tax be paid by all telephone companies on each dollar of their gross receipts "from ... *telephone messages transmitted* wholly within" Pennsylvania. 72 P.S. § 8101 (1971–2000) (emphasis added).

In 2000, the General Assembly again amended 72 P.S. § 8101, and, while continuing to impose the tax on "telephone messages transmitted," excepted from that category:

(i) the sales of access to the Internet ... to the ultimate consumer; and

tion, *The Bell Telephone Company of Pennsylvania,* available at *http://www.library.hbs.edu/hc/lehman/chrono.html?company=the_bell_telephone_co_of_pennsylvania.*

(ii) the sales for resale to persons, partnerships, associations, corporations or political subdivisions subject to the tax imposed by this article upon gross receipts derived from such resale of telecommunications services, including:

(A) telecommunications exchange access to interconnect with a local exchange carrier's network;

(B) network elements on an unbundled basis.

72 P.S. § 8101(a)(2)(i), (ii)(A), (B) (2000–2003). In 2003, the legislature expanded the ambit of 72 P.S. § 8101 to impose the gross receipts tax on gross receipts telephone companies receive from "telephone messages transmitted in interstate commerce, where such messages originate or terminate in this State and the charges for such messages are billed to a service address in this State." 72 P.S. § 8101(a)(2) (2003–present). At that same time, it added "sales of telecommunications services to interconnect with providers of mobile telecommunications services" to the exclusions from the category of "telephone messages transmitted." *Id.* § 8101(a)(2)(ii)(C). It did not, through this amendment, or at any time since, alter the manner of calculating the tax, which is still assessed on each dollar of gross receipts telephone companies receive from "telephone messages transmitted," whether intrastate or interstate. *Id.* § 8101(a)(2).[2]

On December 31, 2004, Verizon filed its annual gross receipts tax report for the tax year 2004, claiming total taxable intrastate gross receipts in Pennsylvania of $1,474,524,745, on which it paid gross receipts tax in the amount of $73,726,237. Thereafter, the Pennsylvania Department of Revenue, with the approval of the Pennsylvania Auditor General ("Taxing Departments"), prepared a proposed "tax settlement" with Verizon which increased its total taxable gross receipts to $2,427,676,531, and assessed Verizon an additional $47,657,590 in gross receipts tax. Verizon filed a petition for resettlement with the Pennsylvania Department of Revenue Board of Ap-

---

**2.** This act also obligates "every limited partnership, association, joint-stock association, copartnership, person or persons, engaged in telephone ... business" to pay this tax as well. 72 P.S. § 8101(a).

peals, which, after consideration of the petition, reduced Verizon's total taxable gross receipts by $754,451,363 to $1,673,225,168, and, correspondingly, lowered the additional amount Verizon was alleged to owe in the proposed tax settlement from $47,657,590 to $9,935,021. Thereafter, the Taxing Departments presented Verizon with a new tax resettlement reflecting the determinations by the Board of Appeals of the additional gross receipts tax Verizon owed.

Verizon subsequently filed a petition for review of this resettlement with the Commonwealth Board of Finance and Revenue in which it sought to exclude from taxable gross receipts, *inter alia*, revenues it had derived from the installation of private phone lines, the provision of directory assistance services, and the imposition of certain non-recurring charges on its customers for: installation of telephone lines, moves of and changes to telephone lines and telephone services, and repairs of telephone lines. Verizon contended that such revenues do not constitute gross receipts from telephone messages under 72 P.S. § 8101(a)(2).[3] The Board of Finance and Revenue denied Verizon's petition for review, whereupon Verizon appealed to the Commonwealth Court.

In a unanimous published opinion authored by Judge McCullough, an *en banc* panel of the Commonwealth Court affirmed the denial of the petition for review in part and reversed in part.[4] *Verizon Pennsylvania v. Commonwealth of Pennsylvania*, 72 A.3d 799 (Pa.Cmwlth.2013). Before the Commonwealth Court, Verizon again contended that revenues from each of the above-referenced charges to its customers did not constitute gross receipts from telephone messages and, thus, were not taxable under 72 P.S. § 8101(a)(2). The court

3. The Commonwealth Board of Finance and Revenue was, at the time of its decision in this matter, comprised of the State Treasurer, the Auditor General, the Secretary of Revenue, the Attorney General, the Governor's General Counsel, and the Secretary of the Commonwealth. The composition of the Board was legislatively changed by Act 52 of 2013, and now consists of the Treasurer, and two members appointed by the Governor, who are confirmed by the Pennsylvania State Senate.

4. The opinion was joined by President Judge Pellegrini, Judge McGinley, Judge Cohn Jubelirer, Judge Simpson, Judge Leavitt, and Judge Brobson.

rejected this contention with respect to the installation of private phone lines and the furnishing of directory assistance services; however, it agreed that revenue from the non-recurring charges for installation of telephone lines, moves of and changes to telephone lines ·and services, and repairs of telephone lines was not subject to taxation under 72 P.S. § 8101(a)(2).

In reaching its determination, the court examined two single judge decisions from the Dauphin County Court of Common Pleas, *Commonwealth v. Bell Telephone Company,* 12 Pa. D. & C. 617 (Dauphin County 1929) (*"Bell I "*), *Commonwealth v. Bell Telephone Company,* 14 Pa. D. & C. 675 (Dauphin County 1930) (*"Bell II "*),[5] and a prior decision from our Court, *Commonwealth v. Bell Telephone Company,* 348 Pa. 161, 34 A.2d 531 (1943) (*"Bell III "*) which, respectively, interpreted and applied the relevant language of the gross receipts tax as it existed in 1889, 1925 and 1941.

By way of background, in *Bell I,* two of the questions presented were whether the gross receipts Bell Telephone of Pennsylvania ("Bell") garnered from, *inter alia,* the sale of directory advertising, the physical installation of regular and custom telephone equipment or service, and the repairs and rearrangement of telephone equipment for subscribers, were taxable under 72 P.S. § 2181 (1889) (repealed), which, as discussed previously, imposed the gross receipts tax on "telephone business" done wholly within Pennsylvania. The court—the Honorable Frank B. Wickersham—ruled that the gross receipts stemming from both activities were subject to the gross receipts tax since they were within the business purpose for which Bell had been incorporated, i.e., the rendition of telephone service.

**5.** Prior to the creation of the Commonwealth Court in 1970, the Dauphin County Court of Common Pleas had jurisdiction over matters in which the Commonwealth was the party plaintiff. Each such case was assigned to a "Commonwealth Docket" in the Dauphin County Court of Common Pleas, and a jurist from that court would adjudicate the issues raised therein. *Simon v. Commonwealth,* 55 Pa.Cmwlth. 225, 422 A.2d 1229, 1230 (1980); Mary Rogers, *The Commonwealth Court of Pennsylvania: Jurisdiction and Jurisdictional Questions,* 47 Temp.L.Q. 86 (1973).

In *Bell II,* Judge Wickersham considered the effect of the 1925 amendments to 72 P.S. § 2181, which levied the gross receipts tax on revenue a telephone company acquired from "telephone traffic" occurring wholly within Pennsylvania, on the taxable status of the gross receipts Bell received from sales of advertising in phone directories, and from the installation of telephone equipment and service by its employees, including the performance of custom work at the subscriber's request. Judge Wickersham concluded that the legislature's substitution of the term "traffic" for "business" in 72 P.S. § 2181, via the 1925 amendments, rendered both of these activities non-taxable.

Judge Wickersham found that, while the legislature did not specifically define the term telephone "traffic," the shift in the focus of the statutory language from "business" to "traffic" was, to him, indicative of the legislature's intent that "traffic" was to have a different meaning than "business" and was to encompass a narrower class of activities. In Judge Wickersham's view, it was significant that the legislature had also amended 72 P.S. § 2181 in 1925 to provide that gross receipts from the business of electric companies would no longer be taxed, but, rather, that only gross receipts from the sale of electricity would be taxable. Judge Wickersham considered this to be indicative of the legislature's intent to make uniform the imposition of the gross receipts tax on electric light, water power, hydro-electric, and telephone and telegraph companies by allowing it to be assessed only on the provision by these companies of particular services; thus, he interpreted telephone traffic to mean the transmission of telephone messages. Applying this interpretation, he concluded that gross receipts from the sales of phone directory advertising and from the installation of telephone equipment and service were not taxable since such revenues were not received by the company from its transmission of telephone messages.[6]

Our Court was asked in *Bell III* to interpret, for the first time, the meaning of "telephone messages transmitted," the

6. Neither *Bell I* nor *Bell II* was appealed to our Court.

phrase introduced in the 1929 statute.[7]    In that case, Bell challenged the Commonwealth's imposition of the gross receipts tax on: (1) revenues from the use of "code-calling" systems and other enhanced signaling equipment which the telephone company installed throughout a subscriber's premises which alerted the subscriber, through sound or flashing lights, that there was an incoming call at his or her telephone; (2) revenues from the use of special equipment, not provided as part of the regular installation process;[8] and (3) revenues from Bell's provision of auxiliary phone lines from the subscriber's location to Bell's central offices, messages transmitted on which were billed to the subscriber's primary phone line.

To determine the taxability of the enhanced signaling equipment, our Court looked to its purpose—namely, that it served to notify a telephone subscriber of an incoming telephone call. Our Court observed that, without this notification, "the telephone conversation—the transmission of the message—cannot take place." *Bell III*, 34 A.2d at 532.    Our court reasoned that, because a charge for using the standard telephone line, which included apparati that gave notice of an incoming call,

7. The legislature amended 72 P.S. § 2181 in 1941 to extend the six-month time periods for the assessment of the tax through the end of 1942, but no alteration was made to the other provisions of this statute enacted in 1929. *See* Act of May 29, 1941, P.L. 72 (codified at 72 P.S. § 2181 (1941) (repealed)).

8. This equipment included: additional telephone receivers, phone call volume amplifiers, "hands free" transmitter sets worn by switchboard operators on their chests, and equipment Bell physically installed on the subscriber's premises such as: coin boxes, equipment which enhanced the audibility of the ringing of the main telephone, extension telephones, foot operated switches which interrupted the phone transmitter, iron boxes which protected outdoor telephone instruments, secretarial switchboards, brackets to hold telephone instruments, terminals which enabled customers to directly make long-distance phone calls, special "wiring plans" which, through the use of physical instrumentalities provided by Bell such as switches, keys, and other special equipment, allowed calls to be handled in ways not permitted by ordinary telephone sets, and additional private lines connecting the subscriber's "branch exchange" (a private telephone switching system connecting telephone lines from a main office of an establishment to individual phones located elsewhere in the establishment) to Bell's central offices, on which Bell charged only a per call fee.

such as a bell or buzzer, was subject to the gross receipts tax, the extension of the signaling apparatus through these added signaling mechanisms "better serves the purpose of summoning the person who is to receive the message," and, thus, is also taxable. *Id.*

As for the second group of special equipment described above, Bell conceded that, while charges for using its standard equipment were subject to the gross receipts tax, it contended that, because these particular items were "not essential for the transmission of messages, the revenue received as a charge for its use should not be considered as being derived from transmission." *Bell III*, 34 A.2d at 533. Our Court rejected this contention, observing:

> This argument overlooks the fact that any device or apparatus which renders the transmission more effective, even though it may not be absolutely needed, is a component part of the transmitting instrumentality; if the Company's argument were valid, it would apply with equal force to dialing equipment, 'French' phones and many other improvements and gadgets, indeed to all telephone equipment other than that used in the first years of telephonic communication. The payments which the subscriber makes to the Company, whether for the use of standard or additional apparatus, are all made by him for the transmission of telephone messages, that being the sole purpose of the subscription.

*Id.*

Our Court viewed the revenue received by Bell from the provision of the signaling and other special equipment as analogous to that which is received by a railroad from customers who paid extra to enhance their traveling experience by riding in a sumptuously appointed Pullman car,[9] noting that the portion of the charges paid by the railroad's customer for the extra amenities and comforts were, nevertheless, still part

9.  A typical Pullman Car, which was constructed with handmade oak or cedar siding, featured elegant dining amenities such as gourmet food, fine china, and silver service, and was outfitted with ornate fixtures and luxurious furniture. *See, e.g.,* Brian Solomon, *Railroads of Pennsylvania,* 87 (2008).

of the overall charges assessed by the railroad for transporting passengers, and, thus, were properly included as gross receipts "for transportation." [10]  *Id.* Likewise, we reasoned that "revenue derived from a telephone subscriber for the use of facilities making telephone communication more satisfactory must be regarded as being a part of the charge for transmission of messages." *Id.*

In determining the taxability of the third group of equipment at issue—the auxiliary phone lines—our Court again focused on the purpose of their installation: to better effectuate transmission of telephone messages for the customer. We noted that the lines enabled the customer to place more than one phone call and to avoid having callers to the main telephone line encounter a busy signal if the line was in use. Inasmuch as the purpose of Bell's furnishing of the auxiliary lines was to enable the transmission of messages—just like the main phone line—we discerned no basis to treat those lines differently for purposes of taxation, and ruled that the charges for the lines were properly included as taxable gross receipts to Bell. *See id.,* 34 A.2d at 533 ("[T]he sole function of the auxiliary lines is to transmit messages in the same manner as the main line, and, consequently they cannot be differently regarded. Viewed from a realistic standpoint the charges for all the lines are revenues obtained from the transmission of telephone messages and therefore constitute taxable receipts under the statute.").

In the case at bar, the Commonwealth Court observed that the present version of the gross receipts tax set forth in 72 P.S. § 8101(a)(2), like the version in effect in 1929 and codified in 72 P.S. § 2181 (1929) (repealed), applies to "telephone

10. *See Pullman's Palace Car Co. v. Commonwealth,* 107 Pa. 148 (Pa. 1884) (interpreting Act of June 7, 1879, P.L. 112, Section 7, which taxed the gross receipts of "any palace car and sleeping car company . . . for transportation."). Contrary to Verizon's argument, discussed below, we did not directly rely on or apply *Pullman's* interpretation of this earlier version of the gross receipts tax as the basis for our holding in *Bell III;* rather, we viewed the facts of the case as illustrative of how the purpose of the services for which a utility company customer pays is determinative of whether the revenue from those payments is subject to this tax.

messages transmitted." *Verizon,* 72 A.3d at 805. After referencing the tenet of statutory construction articulated in 1 Pa.C.S. § 1922(4) that, "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language," the court proceeded to apply our decision in *Bell III* to resolve two of the questions before it. Regarding the first issue of whether the fixed fees Verizon receives from the leasing of private phone lines constituted taxable gross receipts under 72 P.S. § 8101(a)(2), the court found that, because "the sole purpose" of the private telephone lines was to transmit messages, receipts Bell derived therefrom "meet the taxability standard ... in *Bell III.*" *Verizon,* 72 A.3d at 805. The court found that the method of payment for the lines—a flat fee—did not affect the taxability of those payments, as the lines had no other purpose except for the transmission of messages.

With respect to the taxability of Verizon's provision of directory assistance information to customers, and operator assisted or automatic computer placement of calls by Verizon, at customer request, to the phone number of a particular listing (its "ConnectReQuest" service), the court again utilized our Court's analysis in *Bell III* to conclude that revenues Verizon received from these activities was subject to the gross receipts tax under 72 P.S. § 8101(a)(2). The court acknowledged that *Bell III* did not specifically address the question of the taxability of directory assistance services; nevertheless, the court interpreted that case as requiring that the gross receipts tax be assessed on revenue obtained from the provision of any service which makes the transmission of telephone messages more effective and satisfactory. The court also noted that, in order for one of Verizon's customers to obtain directory assistance, or to be connected to the number he or she was looking for, the customer was required to dial one of Verizon's operators, or its automated directory assistance platform—an act involving transmitting a telephone message. Because the court found that both the directory assistance and call placement service made the transmission of telephone

messages more effective and satisfying for Verizon's customers, and that their sole purpose, like the auxiliary lines in *Bell III*, was to transmit telephone messages, the court concluded related revenue was taxable.

By contrast, in assessing the taxability of Verizon's charges to its customers for non-recurring service charges associated with installing, moving, or changing telephone lines and service, and repairing telephone lines, the court concluded *Bell III* was not controlling because it concluded that these types of charges were not at issue in that case, and it viewed the types of charges which were addressed therein as "distinguishable." *Verizon*, 72 A.3d at 806. Instead, the court looked to Judge Wickersham's decision in *Bell II*, even though it acknowledged that the statute at issue in that case—72 P.S. § 2181 (1925) (repealed)—was different since it assessed the gross receipts tax on revenue from "telephone traffic." Nevertheless, the court found Judge Wickersham's analysis relevant, since he defined telephone traffic therein as the transmission of telephone messages, and found that revenue from the work done by Bell's employees in installing telephone equipment was not taxable, since it did not involve the transmission of telephone messages. The court determined that, similarly, when Verizon's employees installed, moved, or changed telephone lines and service for its customers, or repaired their telephone lines, no transmission of phone messages was involved; thus, it concluded that revenue Verizon received from these activities was not subject to the gross receipts tax under 72 P.S. § 8101(a)(2).

Accordingly, the court affirmed the portion of the order of the Board of Finance and Revenue which concluded that charges for the leasing of private lines and for directory assistance services were includable in the gross receipts tax, but reversed the portion of the order which ruled that the non-recurring service charges were subject to the gross receipts tax.

Verizon filed a direct appeal from the order of the Commonwealth Court raising three issues:

1. Whether this Court's decision in [*Bell III* ], is determinative of and/or provides the proper standard to analyze whether revenue from the provision of private lines and directory assistance services, including the "Connect ReQuest" service, is taxable under Section 1101(a)(2) of the Tax Reform Code of 1971, 72 P.S. Section 8101(a)(2)[.]

2. Whether revenue from the provision of private lines constitutes gross receipts from telephone messages transmitted under Section 1101(a)(2) of the Tax Reform Code of 1971, 72 P.S. Section 8101(a)(2)[.]

3. Whether revenue from the provision of directory assistance services, including the "Connect ReQuest" service, constitutes gross receipts from telephone messages transmitted under Section 1101(a)(2) of the Tax Reform Code of 1971, 72 P.S. Section 8101(a)(2)[.]

Verizon's Brief at 2–3. The Commonwealth cross-appealed, raising one issue:

Whether, for purposes of Pennsylvania's Telecommunications Gross Receipts Tax, revenue from the following non-recurring charges: (i) installation of telephone lines[;] (ii) moves of, and changes to telephone lines and services[;] and (iii) repairs of telephone lines are properly included in taxable gross receipts[.]

*Verizon v. Commonwealth,* No. 70 and 74 MAP 2013 (10/17/2014) (order).[11, 12]

## II. Verizon's Appeal

### A. Continuing viability of *Bell III*

Beginning with its first appellate issue, Verizon states its central and recurring claim. In Verizon's view, our *Bell III* decision was erroneously decided, and, thus, it argues we should not adhere to the doctrine of *stare decisis*. Instead,

11. We allowed oral argument only on the issue raised in the Commonwealth's cross-appeal.

12. As these questions involve the interpretation of the language of a taxing statute and, thus, are questions of law, our standard of review is *de novo* and our scope of review is plenary. *Dechert L.L.P. v. Commonwealth,* 606 Pa. 334, 998 A.2d 575, 579 (2010).

Verizon urges that we reconsider that decision and refuse to apply its holding to resolve the question of whether revenue it derives from the services and equipment at issue in this appeal is subject to the gross receipts tax. In support of this contention, Verizon argues that our Court in *Bell III* wrongly referenced the *Pullman* decision, *see supra* note 10, as support for our holding because that case involved the interpretation of a different version of the gross receipts tax not at issue, and, also, because, in its view, our Court did not properly recognize that the legislature's change in the subject of the gross receipts tax paid by telephone companies, from telephone "traffic" in the 1925 version of the gross receipts tax, to "telephone messages transmitted" in the 1929 version of the gross receipts tax, signified its intent to ascribe a wholly different meaning to the latter phrase. Verizon, relying on Section 1921(b) of the Statutory Construction Act, proffers that our Court should undertake a reinterpretation of the words "telephone messages transmitted" and define them in accordance with what it characterizes as their plain meaning.

To establish what it considers to be the plain meaning of the terms "message" and "transmitted," Verizon relies on various secondary sources, such as telecommunications industry manuals which define a message as a "completed call, i.e., a communication in which conversation or exchange of information took place between the calling and called parties," and dictionaries of the English language such as Webster's, which defines "transmitted" as "to send or convey from one person or place to another." Appellant's Brief at 25–27 (quoting, *inter alia, Newton's Telecom Dictionary* 592–93 (24th ed.2008) and *Merriam Webster's Collegiate Dictionary*, 1329 (11th ed.2012)). Based upon these definitions, Verizon argues that the plain meaning of "telephone messages transmitted" limits the application of the gross receipts tax to only completed phone calls which take place entirely within Pennsylvania, and, thus, such tax should be assessed only on a per-message basis. Verizon maintains that its suggested interpretation is also supported by the fact that, when the legislature extended the tax in 2003, it specified a required origin and billing address

for interstate telephone messages in order to make them taxable.[13] Verizon argues that, when the legislature has intended that a tax be calculated on telecommunications services other than on a per-message basis, it has plainly said so in the taxing statute, citing as an example the sales tax which is imposed on the total amount customers pay for telecommunications services, whether or not such service is charged to the customer by flat rate or by individual message.

Additionally, Verizon suggests that the Federal Excise Tax ("FET") as it existed in 1919 provides suitable guidance on how the 1929 version of our gross receipts tax should be interpreted, as the FET was also imposed on the transmission of telephone messages, but separately levied any wire leased from the telephone company. Thus, in Verizon's view, the fact that Congress did not consider an excise tax on messages to be broad enough to encompass charges for private lines should inform our interpretation of the 1929 gross receipts taxing statute.

Further, Verizon, relying on the expert report and deposition testimony of Dr. William E. Taylor, an economist with expertise in telecommunications issues, argues that our Court failed to take into account important public policy and economic considerations in determining what constituted "telephone messages transmitted" in the 1929 version of the gross receipts tax. Verizon claims that it was the General Assembly's desire to promote universal access to the telephone network by not imposing the tax on equipment or services which only allowed access, but, instead, restricting the tax to use of the telephone network to send long distance messages, which was a luxury only a few subscribers could afford at that time.[14]

13. Verizon also cites as support for its suggested construction of these terms the Department of Revenue's definition of the term "message" in its Gross Receipts Taxing Manual ("GRTM") as a "complete transmission of data or text," and a 2004 publication which stated that the Department would apply the gross receipts tax to charges for "interstate landline calls". Verizon's Brief at 25, 27 (quoting G.R.T.M., at 147; *The Tax Compendium*, Commonwealth of Pennsylvania, Dept. of Revenue at 26 (March 2004)).

14. The Pennsylvania Telephone Association, an organization of telephone companies which provide local telephone service in rural areas

The Commonwealth replies that the Commonwealth Court properly looked to our decision in *Bell III* as governing the question of whether the equipment and services at issue in this appeal were subject to the gross receipts tax under 72 P.S. § 8101(a)(2). The Commonwealth highlights that the relevant terminology—"telephone messages transmitted"—which appeared in the 1929 version of the gross receipts tax, and was construed by our Court in *Bell III*, is presently contained, unchanged, in 72 P.S. § 8101(a)(2). The Commonwealth argues that, because the General Assembly did not alter this controlling statutory language after our Court interpreted it in *Bell III*, even though it has amended the gross receipts tax statute repeatedly since the time of that decision, this establishes that our Court's interpretation is in accord with the General Assembly's intent as to the proper meaning of this phrase.

Responding to Verizon's attacks on the purported legal soundness of the *Bell III* decision, the Commonwealth refutes Verizon's various contentions in support thereof: The Commonwealth asserts that the doctrine of *stare decisis* should be applied by our Court in adhering to our *Bell III* decision because that case involved the construction of a statute, and our Court has recognized that adherence to *stare decisis* has

of the Commonwealth, has filed an *amicus* brief supporting Verizon's request that we revisit *Bell III*. *Amicus* contends that the rationale of *Bell III*, which regarded the purchase of telephone equipment and services as synonymous with "messages transmitted," was the product of Bell telephone's monopoly status at that time, since Bell both transmitted telephone messages on its network, and also provided to the customer all telephone equipment, wiring, and installation services. Thus, in the view of *amicus*, "the lease of facilities from Bell was synonymous with transmission of messages by Bell." Amicus Brief at 8. *Amicus* proffers that since this monopoly no longer exists, and a wide variety of other companies are now able to furnish both telephone equipment and perform in-home telephone installation services, *Bell III's* rationale no longer applies, and the gross receipts tax should now be more narrowly interpreted as applying only to the transmission of individual telephone messages by a telephone company. *Amicus* argues that applying such a restrictive interpretation would ensure that the tax would only be assessed on telephone companies whenever the companies actually transmit a message, and that it would not be imposed whenever other persons or entities sell or install telephone equipment, or provide in-home wiring services.

"special force" in these types of matters since the legislature is free to correct any error that it perceives in our interpretation of its intentions. Commonwealth's Brief at 21 n. 10 (quoting *Hunt v. Pa. State Police,* 603 Pa. 156, 983 A.2d 627, 637–38 (2009)). The Commonwealth further argues, in this regard, that none of the commonly accepted reasons for departing from *stare decisis* exist here, as *Bell III* was not recently decided, nor is there any indication that either our Court or the General Assembly has since viewed its interpretation as erroneous.

As for the phrase "telephone messages transmitted," the Commonwealth contends that our *Bell III* decision has transformed the phrase into a "term of art," with a unique and specific connotation that is expansive. Accordingly, the Commonwealth argues that the language used in different statutes cited by Verizon, such as the FET, has little relevance in determining the meaning of this particular phrase. The Commonwealth also disputes that the 2003 amendments to 72 P.S. § 8101(a)(2) had any effect on our Court's interpretation in *Bell III* since, in its view, those amendments merely expanded the scope of the tax to include interstate commerce, but did not change the operative language—"telephone messages transmitted"—which remains the same and is applied in the relevant intrastate and interstate commercial contexts.

The Commonwealth also denies that it has ever agreed with Verizon's suggested interpretation of this language, and it characterizes the passages from the various Department of Revenue tax publications referred to by Verizon as not reflective of its formal legal position on the proper definition of this phrase. The Commonwealth contends that, by contrast, as it explained in responses to interrogatories filed in connection with this litigation, it has always taken the position that the legal meaning of "telephone messages transmitted" is that which has been established by statute or interpretive caselaw.

Additionally, the Commonwealth disputes the assertion of Verizon's expert—Dr. Taylor—that the legislature's alteration of the statutory language from telephone traffic in the 1925 version of the gross receipts tax statute, to "telephone mes-

sages transmitted" in the 1929 version of that statute, was motivated by the economic and policy reasons he cited. The Commonwealth notes that there is no support for Dr. Taylor's conclusions from the legislative record, or any other source, and cites to the contradictory factual testimony and report of its own expert—Dr. Lee Selwyn—an expert in the fields of economics and telecommunications, who challenges the accuracy of Dr. Taylor's interpretation of the meaning of "telephone messages transmitted." In his expert report, Dr. Selwyn expressed the view that Dr. Taylor did not accurately portray the manner in which telephone service was actually provided in the 1920's—i.e., that Bell, in fact, charged a flat fee for local telephone service and did not impose a per-message charge—and that Dr. Taylor disregarded our *Bell III* decision in rendering his opinions.

In determining whether the revenue Verizon receives from furnishing the services and equipment at issue in this appeal constitutes revenue received from "telephone messages transmitted" as this provision is used in the present version of the gross receipts tax—72 P.S. § 8101(a)(2)—we do not write on a clean slate, as if we were interpreting the meaning of this statutory language for the first time. As the Commonwealth Court and the parties have recognized, our Court in *Bell III* construed this very language, which was also contained in the 1941 version of the gross receipts tax, 72 P.S. § 2181 (repealed), at issue in that case.[15] Consequently, the majority of Verizon's arguments, which are structured as if our Court were undertaking an original interpretation of this terminology by urging that we employ traditional methods of statutory construction to ascertain its meaning—e.g., looking to dictionary definitions, the interpretation of similar language in federal laws by federal courts, and public policy considerations—have little applicability. Our Court's interpretation of

15. The parties do not discuss, in this regard, whether, under the doctrine of *res judicata,* Verizon Pennsylvania may relitigate this issue against the Commonwealth, given that it is a direct corporate successor of Bell Telephone of Pennsylvania—the appellant in *Bell III. See* Corporate History—Verizon Bell Atlantic Corporation, available at *http://transition.fcc.gov/wcb/armis/carrierfilinghistory/COSAHistory/bntr.htm.* Therefore, this question is not before us in the present appeal.

this language in *Bell III* is long-standing, and has not been altered by any subsequent decision of our Court. Most importantly, in the over 70 years which have passed since that decision, the General Assembly, while amending the gross receipts tax statute containing this language 28 times, including a complete reenactment of this statutory provision as part of a comprehensive overhaul of the tax code in 1971, has not, at any time, changed this language specifying the method of imposing the tax on telephone companies such as Verizon.[16]

■ One of the most venerable and fundamental tenets of statutory interpretation is that, whenever our Court has interpreted the language of a statute, and the General Assembly subsequently amends or reenacts that statute without changing that language, it must be presumed that the General Assembly intends that our Court's interpretation become part of the subsequent legislative enactment. *See, e.g., Fonner v. Shandon, Inc.*, 555 Pa. 370, 724 A.2d 903, 906 (1999) ("The failure of the General Assembly to change the law which has been interpreted by the courts creates a presumption that the interpretation was in accordance with the legislative intent; otherwise the General Assembly would have changed the law in a subsequent amendment."); *Parisi v. Philadelphia Zoning Bd. of Adjustment*, 393 Pa. 458, 143 A.2d 360, 363 (1958) ("[W]hen, in a later legislative enactment, the same language is used as in a prior cognate statute, which has been construed by us, the presumption is that the language thus repeated is to be interpreted in the same way it previously had been when we passed upon the earlier enactment."); *Commonwealth v. Wanamaker*, 450 Pa. 77, 296 A.2d 618 (1972) (applying this principle to the interpretation of language in a reenacted taxing statute). This common-law presumption was legislatively enshrined in the very first "Statutory Construction Act"

16. Likewise, because our interpretation of "telephone messages transmitted" in *Bell III* is well-settled, the canon of statutory interpretation set forth in 1 Pa.C.S. § 1928(b)(3), providing that taxing statutes are to be strictly construed in favor of the taxpayer does not govern this matter either. This canon is implicated only in situations whenever there has been no prior definitive conclusion by our Court regarding the meaning of ambiguous statutory language. *Dechert*, 998 A.2d at 584 n. 8.

("SCA") passed by the General Assembly in 1937, *see* 46 P.S. § 552 (repealed), and it remains a canon of statutory interpretation contained within the current version of the SCA enacted in 1972. *See* 1 Pa.C.S. § 1922(4) ("[W]hen a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language.").

█ Accordingly, as our Court has emphasized, "the General Assembly is quite able to address what it believes is a judicial misinterpretation of a statute." *Hunt*, 983 A.2d at 637. As noted, our decision in *Bell III* was handed down over seven decades ago, and it has been known to the General Assembly for that entire period of time; yet, that body has not deemed it necessary to amend the meaning of the phrase "telephone messages transmitted." Indeed, in 2003, when the legislature imposed the gross receipts tax on other types of revenues telephone companies derived from conducting interstate commerce, it continued to require that the mechanism of calculation of the tax be on "telephone messages transmitted," without alteration. At no point over the years which have elapsed since *Bell III* was decided has the legislature redefined this provision, and so we must conclude that the General Assembly is satisfied with our interpretation of its scope as delineated in *Bell III*.

In *Bell III*, we held that "telephone messages transmitted" includes any item of equipment, and any service which "renders the transmission of [telephone messages] more effective," or makes "telephone communication more satisfactory." *Bell III*, 34 A.2d at 533. Because the General Assembly has not seen fit to limit the definition of this provision in the manner Verizon suggests—i.e., narrowing it to only the act of transmitting and receiving individual telephone messages—we will not substitute our judgment for that of the legislature and, through a new interpretation, rewrite the statute in the manner which Verizon desires.

With respect to Verizon's argument that *Bell III* should be overruled, because, in its view, that case was erroneously decided, as the Commonwealth highlights in its argument, we regard the rule of *stare decisis* as compelling our Court's close adherence to our prior decisions construing statutory language. *Williams v. GEICO,* 613 Pa. 113, 32 A.3d 1195, 1208 (2011); *In re Burtt's Estate,* 353 Pa. 217, 44 A.2d 670, 677 (1945) ("A statutory construction, once made and followed, should never be altered upon the changed views of new personnel of the court."); *Commonwealth v. Fields,* 107 A.3d 738, 741, 630 Pa. 625 (2014) ("[T]he question of whether a prior exercise in statutory construction should be overruled is a sensitive one that should only be undertaken when reasonably necessary."). While Verizon is correct that departure from the doctrine of *stare decisis* is justified in those instances where our Court has "distorted the clear intention of the legislative enactment and by that erroneous interpretation permitted the policy of that legislation to be effectively frustrated," *Mayhugh v. Coon,* 460 Pa. 128, 331 A.2d 452, 456 (1975), we do not consider this to be such a situation.

In addition to the strong presumption that our interpretation of this statutory provision in *Bell III* has been in harmony with the General Assembly's intent due to the fact that body has chosen not to amend that language in response to that decision, we also find it significant that, since *Bell III,* the legislature *has* specifically elected to exempt from this tax certain other equipment and services sold by telephone companies, but not the equipment and services at issue in this case. As discussed *supra,* in 2000, the General Assembly amended 72 P.S. § 8101 to expressly exclude from the category of subjects of taxation comprising "telephone messages transmitted" certain services which telephone companies such as Verizon directly sell to all customers, namely, sales of access to the internet. 72 P.S. § 8101(a)(2)(i). The General Assembly also excluded sales of telecommunications services by telephone companies to other private and governmental customers which are required to pay the gross receipts tax

upon their resale of such services. 72 P.S. § 8101(a)(2)(ii).[17] As this illustrates, the General Assembly is eminently capable of expressly excluding certain services and equipment sold by telephone companies from the gross receipts tax. The fact that the legislature has declined to provide such an exclusion for the services and equipment at issue in this case, even though it did so for other enumerated types of services and equipment, underscores, in our view, its intent not to exclude these services and equipment from the gross receipts tax. *Cf. Penn. Power v. Commonwealth,* 553 Pa. 1, 717 A.2d 504 (1998) (holding that, where electric companies were required to pay the gross receipts tax on "sales of electric energy," and the legislature did not expressly define that term, nor specifically exclude late charges placed on customer's unpaid bills for electricity, revenues the company received from those finance charges was properly considered by the Department of Revenue as within the statutory definition and, thus, subject to the gross receipts tax). Consequently, we discern no justification for departing from the principle of *stare decisis,* and we reaffirm that *Bell III* continues to furnish the proper legal standard to determine whether the revenue telephone companies derive from the sale of equipment or services to their customers is subject to the gross receipts tax.

## B. Application of *Bell III* to Verizon's claims

We next consider whether the monies Verizon takes in from its customers for the specific equipment and services at issue in this appeal are taxable under the *Bell III* standard. First, Verizon argues that, under the plain language of 72 P.S. § 8101(a)(2), only receipts it derives from the actual transmission of messages are taxable, and, thus, the revenues it garners from its provision of private lines to its customers are not taxable since it does not bill its customers for this service

17. Included in this category are sales of unbundled "network elements," which are items of physical equipment used by telephone companies to, *inter alia,* transmit telephone messages. 72 P.S. § 8101(a)(2)(ii)(B). In 2003, the General Assembly further excepted from this category "sales of telecommunications services to interconnect with providers of mobile telecommunications services." 72 P.S. § 8101(a)(2)(ii)(C).

based on the number of telephone messages which are transmitted over the private lines, but, rather, it charges them one flat monthly fee for the lines.[18] Verizon deems it irrelevant that the private lines may be used to transmit telephone messages, as it reasons that only charges for actual telephone messages, i.e., completed calls, are taxable. Verizon further contends that the Commonwealth Court's decision improperly expands the scope of the *Bell III* decision inasmuch as it views that decision as resting on Bell Telephone's concession that standard equipment and main lines are taxable; hence, according to Verizon, it was logical that our Court would conclude that the supplemental equipment and lines attached to the main lines were, by extension, also taxable. Verizon stresses that it presently makes no similar concession that revenues it obtains from its standard equipment and main telephone lines are subject to the gross receipts tax.

In reply, the Commonwealth notes that Bell Telephone made a similar argument in *Bell III* with respect to the auxiliary phone lines at issue in that case, suggesting therein that, because charges for messages sent over the auxiliary lines were billed to the main line, the charges for the lines were for "additional facilities and not for the transmission of messages." *Bell III*, 34 A.2d at 533. The Commonwealth emphasizes that we rejected this argument on the grounds that we did not consider the method in which charges for the service were billed by Bell Telephone to its customers as being determinative of whether the revenue from such charges

18. The parties have stipulated that the type of private line at issue in this case is:

[A] dedicated, uninterrupted telecommunications channel typically leased by the customer from a telecommunications provider that interconnects two locations and provides the customer with exclusive use of that telecommunications channel that is used for the transmission of communications of any type (*i.e.*, voice, data, and/or video) between the two endpoints of the private line.

Stipulation of Fact, 11/21/12, at 6. Additionally, the parties agree that Verizon "provides private line service to its customers over transmission facilities that are either owned or leased by Verizon," and that, "[i]n some circumstances a portion of the same facilities used to provide private line service may also be used to provide other Verizon [ ] services, including basic local telephone service." *Id.* at 7.

was subject to the gross receipts tax, but, rather, our Court considered the purpose which the auxiliary line service served—the transmission of messages—as dispositive of this question. The Commonwealth urges that Verizon's present argument should also be rejected, since, just like the auxiliary lines in *Bell III*, the private lines at issue in this case have no other purpose except for transmitting messages; thus, receipts from the provision of those lines should be considered subject to the gross receipts tax. The Commonwealth argues that telephone companies should not have the power to determine the taxability of a particular service simply by choosing the manner in which the service is billed to the customer, which, in its view, would allow them to circumvent the purpose of the statute.

In *Bell III*, our Court made clear that the question of whether a telephone company's revenues from charges to its customers for providing lines are subject to taxation does not depend on how the telephone company chooses to bill its customers for the lines:

> The Company points out that messages over the auxiliary lines are charged only to the first line, and therefore contends that the charge for auxiliary lines is for the additional facilities and not for the transmission of messages. *This method of bookkeeping, however otherwise proper, cannot disguise the fact that the sole function of the auxiliary lines is to transmit messages in the same manner as the main line,* and consequently they cannot be differently regarded.

*Bell III*, 34 A.2d at 533 (emphasis added). Rather, as this passage establishes, our taxability determination regarding the auxiliary lines in *Bell III* was, as the Commonwealth argues, an objective inquiry which focused entirely on the purpose which the lines served—to transmit messages—and, hence, was not dependent on the company's subjective decision to concede the taxability of its standard lines and service. Consequently, we reject Verizon's assertion that its predecessor's concessions in *Bell III* formed the basis of our holding in that case.

Likewise, our *Bell III* decision did not condition the taxability of the lines on the volume of messages which would be transmitted over them. As discussed above, under our holding in *Bell III*, all equipment sold by a telephone company which "renders the transmission of [telephone messages] more effective," or makes "telephone communication more satisfactory," *Bell III*, 34 A.2d at 533, is included within the meaning of the phrase "telephone messages transmitted" as used in the gross receipts taxing statute. *Bell III*, 34 A.2d at 533. The private lines at issue here serve these purposes. As stipulated by the parties, these lines are exclusively for the use of the customers who purchase them, and they allow those customers to directly, securely, and continuously transmit telephone messages between specific endpoints. *See supra* note 18. Thus, these lines provide customers with instantaneous and enhanced telephone communications capabilities beyond those afforded by the public telephone network. *See Newton's Telecom Dictionary* 968 (28th ed.2014) (observing that "private lines provide full-time and immediate availability, eliminating dial-up delays and avoiding any potential for congestion in the core of the carrier networks."). We, therefore, have little difficulty in concluding these private lines render the process of telephone communication more effective and satisfactory for Verizon's customers who purchase such lines. Consequently, under 72 P.S. § 8101(a)(2), revenues Verizon receives from the sale of such private lines are subject to the gross receipts tax, as the Commonwealth Court and the Board of Finance and Revenue concluded.

■ Verizon next argues that the fixed directory assistance fee, which it charges its customers when they call either its operators or its automated directory assistance operating platform to obtain a telephone number, as well as the fee it charges its customers to directly dial the requested telephone number—its ConnectReQuest service—are not fees for telephone messages transmitted, according to the plain meaning of those terms. Rather, Verizon asserts that what customers are paying for is merely information.[19]

19. Verizon also makes a broader claim that allowing the gross receipts tax to be imposed on these directory assistance services, and other such

In response, the Commonwealth endorses the reasoning of the Commonwealth Court that the directory assistance and ConnectReQuest services are subject to the gross receipts tax because they enable Verizon's customers to transmit messages more satisfactorily. Additionally, the Commonwealth notes that Verizon stipulated that the directory assistance fee it charges covers both the telephone transmissions between the customer and Verizon's operator, as well as the listing information for the phone number, and it has not attempted to separate out charges for the information component of that fee. The Commonwealth asserts that, ultimately, Verizon has not refuted the Commonwealth Court's holding that "the sole purpose of these services is to transmit messages," and, thus, that these services are taxable just like the auxiliary lines at issue in *Bell III*. Commonwealth Brief at 18 (quoting *Verizon*, 72 A.3d at 806).

Applying the *Bell III* test, we conclude that receipts Verizon took in from the sales of its directory assistance service and the ConnectReQuest service were both subject to the gross receipts tax under 72 P.S. § 8101(a)(2), as both services make the process of telephone communication more satisfactory to the customers who pay fees to Verizon to use them. A customer uses Verizon's directory assistance service when he or she does not know the telephone number of the party he or

services, would be tantamount to resurrecting the 1889 statute and making all aspects of the "telephone business" subject to the gross receipts tax. We reject this assertion. As discussed above, our holding in *Bell III*, that all equipment and service sold by a telephone company which renders the transmission of telephone messages more effective, or makes telephone communication more satisfactory, is included within the meaning of the phrase "telephone messages transmitted," fundamentally requires that the particular equipment or service in question serve the purpose of effectuating the transmission of telephone messages. Thus, it is only a telephone company's receipts from the sale of those pieces of equipment which facilitate the transmission of telephone messages by acting as an instrumentality for the electromechanical sending and receiving of such messages, and only a telephone company's receipts from the sale of those services which make the process of sending and receiving telephone messages more satisfactory for the purchaser, which are subject to this tax. This tax, therefore, does not cover receipts which a company such as Verizon derives from other aspects of its overall business activities which do not serve these core purposes.

she is trying to call; thus, in those situations, when the customer pays Verizon a fee for use of this service, the purpose of the payment is for Verizon's employee, or its automated program, to access Verizon's telephone subscriber database and find the phone number the customer needs, in order for the customer to call the party he or she is trying to reach. Since dialing the correct telephone number is an indispensable component of the customer's actual placing of the telephone call to the party he or she is trying to reach, the customer's payment for access to this number is not merely, as Verizon suggests, to acquire the information about the number for its own sake; rather, the customer is paying the fee so that he or she can then use the information to perform the act of transmitting a telephone message to the party. Thus, because Verizon's directory assistance service fulfills the purpose of making the process of the transmission of telephone messages more satisfactory to the customer by enabling the customer to transmit the telephone messages to the party of his or her choice, fees Verizon charges its customers for that service are properly taxable under 72 P.S. § 8101(a)(2), as the Board of Finance and Revenue and the Commonwealth Court determined.

Similarly, the ConnectReQuest service also serves the function of making telephone service more satisfactory to the customer who pays a fee to Verizon to use it. This service enables a customer, while on the line with the operator who has retrieved the telephone number from Verizon's database, or while still connected to Verizon's automated directory assistance platform, to have that operator or the platform immediately place a call to that telephone number. The customer thus avoids the need to transcribe the number, disconnect the call with the operator or platform, and then redial the number of the party with whom he or she wishes to communicate. This saves the customer time and enables him or her to make the telephone call, i.e., to transmit a telephone message, in a more expedient and convenient fashion; hence, the ConnectReQuest service makes the process of transmitting a telephone message more satisfactory for the customer than had

the customer not used it. Consequently, revenues Verizon receives therefrom are also taxable gross receipts under 72 P.S. § 8101(a)(2), as found by the Board of Finance and Revenue and the Commonwealth Court.[20]

### III. The Commonwealth's Cross–Appeal

We turn now to the issue raised by the Commonwealth in its cross-appeal regarding the propriety of the Commonwealth Court's decision finding that charges from the installation of telephone lines; moves of, and changes to telephone lines and services; and repairs of telephone lines were not taxable under 72 P.S. § 8101(a)(2).[21] The Commonwealth argues that the Commonwealth Court, while properly recognizing that our Court's interpretation of the phrase "telephone messages transmitted" in *Bell III* was reaffirmed by the General Assembly through subsequent enactments of the gross receipts taxing statute, nevertheless, inappropriately failed to apply the holding of *Bell III* in analyzing the taxability of the revenues Verizon receives by performing these services for its customers. Instead, in the Commonwealth's view, the Commonwealth Court incorrectly applied Judge Wickersham's ruling in *Bell II*, which interpreted the 1925 statute which had different language and is no longer in effect. The Commonwealth contends that our Court specifically recognized in *Bell III* that revenue from code calling systems and signal apparatus constituted taxable gross receipts, since such equipment allowed the transmission of telephone messages to take place by informing a person away from his or her telephone that there was an incoming call—thereby permitting that person to answer the call and receive the message.

20. Additionally, as noted by the Commonwealth Court, in order for a customer to use Verizon's directory assistance and ConnectReQuest services, the customer must place a phone call to a Verizon operator or its automated call handling platform. Thus, even under Verizon's suggested restrictive interpretation of "telephone messages transmitted," both of these services would be taxable since their use involves the actual transmission of a telephone message.

21. In the proceedings below, Verizon stipulated that a finding that any one of these services is taxable constitutes a finding that all such services are taxable, since it cannot separate the charges imposed for each category of service.

Commonwealth's Brief at 24–25. The Commonwealth reasons that:

If charges for equipment and facilities that make telephonic communications more effective or satisfactory are properly within the scope of taxable gross receipts then the costs associated with installing telephone service present an equally if not more compelling case for inclusion. Absent payment of installation charges, a customer cannot obtain basic telephone service.

*Id.* at 25.

Further, the Commonwealth notes that moving and changing telephone lines and service, and repairing such lines, also come within the ambit of the gross receipts tax, as these services make transmission of telephone messages more effective:

Customers would not request repair services at additional expense absent their being some interruption or distortion to their service [and] would not incur the additional expense of having components of their telephone lines or services moved or changed absent a gain in either the effectiveness or the basic local telephone service or the convenience of using such a service.

*Id.*

Verizon counters by echoing the Commonwealth Court's finding that *Bell II* is the governing legal authority because, in that case, the court defined "telephone traffic," as used in the 1925 statute, to mean the transmission of telephone messages, and, in Verizon's view, correctly concluded that these types of non-recurring service charges were not taxable since they did not involve the actual transmission of telephone messages. Verizon argues this is consistent with its view that the plain language of the statute allows the tax to be imposed only on actual messages transmitted and, thus, its imposition is restricted to completed telephone calls. Verizon again renews its contention that allowing services to be taxed, merely because they render telephone communications more effective or satisfactory, significantly expands the scope of the gross

receipts tax to include all business activities of telephone companies, as, from its perspective, the majority of such activities are done for the purposes of customer service. Verizon claims this is an erroneous interpretation, not in accord with the changes in the statutory language from 1889 to 1925.

We agree with the Commonwealth that the Commonwealth Court erred by following the *Bell II* decision in determining whether the revenues Verizon receives from charges to its customers for performing the services at issue are taxable under 72 P.S. § 8101(a)(2). As we have discussed above, the 1925 statute interpreted by Judge Wickersham in *Bell II* imposed the gross receipts tax on telephone "traffic," not on "telephone messages transmitted," as did the 1941 statute at issue in *Bell III*, and as does the current version of the gross receipts tax. Consequently, our Court's interpretation of "telephone messages transmitted" in *Bell III* was the first time our Court construed this language, and, as that decision remains the governing interpretation regarding the taxability of the sales of telephone equipment and services, it controls the disposition of this matter.

Under *Bell III*, a telephone company's charges to its customers for services that render the transmission of telephone messages more effective, or which make the process of telephone communication more satisfactory, are taxable gross receipts, irrespective of the manner in which they are billed to the customer. *See Bell III*, 34 A.2d at 533 (manner of billing charges for use of auxiliary lines irrelevant to determine taxability as purpose of use of the lines was determinative). Thus, we agree with the Commonwealth that, when a customer pays Verizon a one-time fee for its installation of telephone lines, this unquestionably makes his or her ability to transmit telephone messages more effective, since, absent those lines, the making and receiving of telephone calls is impossible. Likewise, when a customer pays for repair service for telephone lines, this also has the result of making telephone service more effective, since, as the Commonwealth suggests, the customer would not pay for such repairs unless he or she

was experiencing difficulty transmitting messages through the telephone lines. As the performance of the repair service removes the customer's obstacles to the transmission of telephone messages by fixing the problems with the lines that led to the impediment, it ultimately makes the customer's ability to transmit telephone messages more effective. Consequently, we conclude that, contrary to the finding of the Commonwealth Court, the revenue Verizon derives from the fees it charges for each installation and repair of a telephone line are taxable under 72 P.S. § 8101(a)(2).

We further conclude that payments made by customers for moves of and changes to telephone lines and services also meet the requirements for taxability under *Bell III*. If a customer chooses to pay for a move of his or her telephone line, or pays to change his or her telephone service, the customer is doing so because the current location of the line, or the nature of his or her current service, is displeasing. Movement of the customer's lines, or alteration of the customer's phone service to better suit the customer's needs and wishes, makes the customer's use of the telephone service more satisfactory, much like the installation of a telephone line in the first instance. As a result, revenue Verizon receives from customer payments for these services is also taxable under 72 P.S. § 8101(a)(2), and we reverse the order of the Commonwealth Court which determined they were not.

## IV. Conclusion

We affirm the order of the Commonwealth Court which found that revenue from Verizon's sale of private lines and directory assistance services to its customers is subject to the gross receipts tax imposed by 72 P.S. § 8101(a)(2). We reverse the order of the Commonwealth Court to the extent that it determined that non-recurring charges to its customers for the installation of telephone lines; moves of, and changes to telephone lines and services; and repairs of telephone lines are not taxable under 72 P.S. § 8101(a)(2).

Order affirmed in part and reversed in part. Jurisdiction relinquished.

Justices BAER and STEVENS join the opinion.

Chief Justice SAYLOR files a concurring and dissenting opinion.

Justice EAKIN files a concurring and dissenting opinion.

Chief Justice SAYLOR, concurring and dissenting.

I would affirm the judgment of the Commonwealth Court.

The Tax Reform Code of 1971 ("Code"), by its terms, imposes a tax upon gross receipts from "telephone messages transmitted." 72 P.S. § 8101(a)(2). Initially, I agree that directory assistance charges are taxable pursuant to this description, as the information concerning the number sought is transmitted by telephone to the requester. As well, any receipts from the follow-on "ConnectReQuest" service pertain to an essential component of a transmitted message since the customer is only charged if a connection is made. *See* Majority Opinion, at 605–07, 127 A.3d at 761–63; *see also Verizon Pa., Inc. v. Commonwealth*, Stipulation of Facts I, ¶ 31 (Pa. Cmwlth. Nov. 21, 2012) (*"Stipulation I"*) (explaining that the customer is only charged for the follow-on service if a successful connection to the requested number is completed).

Applicability of the tax to charges for the leasing of private lines presents a substantially different question, in my view, because such leasing does not in itself entail the transmission of any messages. Thus, if we were writing on a clean slate, I would conclude that charges for these dedicated lines do not constitute gross receipts for "telephone messages transmitted," particularly in view of the principle that statutes imposing taxes are to be strictly construed with doubts about their reach resolved in favor of the taxpayer. *See* 1 Pa.C.S. § 1928(b)(3).[1]

---

[1] I disagree with the majority's assertion that this principle has no application to the present case. *See* Majority Opinion, at 598 n. 16, 127 A.3d at 757 n. 16. Telecommunications technology, by its nature, changes and evolves over time, with the result that new services and technologies regularly emerge. As this case illustrates, questions will inevitably arise concerning whether the tax—by its plain terms or via an interpretative overlay—applies in new circumstances. Although the

As the majority observes, however: in *Commonwealth v. Bell Telephone Company of Pennsylvania*, 348 Pa. 161, 34 A.2d 531 (1943) ("*Bell III*"), this Court interpreted the predecessor statute to implicate charges for "any device or apparatus which renders the transmission [of phone messages] more effective," *id.* at 165, 34 A.2d at 533, as well as "facilities making telephone communication more satisfactory," *id.* at 166, 34 A.2d at 533; and the Legislature has effectively directed us to presume it intends such interpretation to apply to the Code, which represents a reenactment of the prior statute undertaken without any change to the relevant language. *See* 1 Pa.C.S. § 1922(4); Majority Opinion, at 598–99, 127 A.3d at 757–58 (citing cases). *See generally Bell III*, 348 Pa. at 162, 34 A.2d at 532 (reciting the relevant language of the predecessor statute). With that said, I note as an aside that the *Bell III* Court's fidelity to the principle of strict construction may be questioned.[2] In my reading, the decision appears to have employed a particularly broad interpretation of the term "telephone messages transmitted." Be that as it may, the decision has not been overruled, and in the 72 years since it was decided the General Assembly has not seen fit to clarify the intended scope of the tax—notwithstanding that body's role as the branch of government primarily concerned with shaping public policy and its superior ability to assess the implications of the major changes that have occurred in the telecommunication industry. *See generally* Brief for Appellant at 33–37 (discussing public policy implications inherent in the way a telecommunications tax is devised). I find this state of affairs an unhappy one and would welcome a decision by the

majority references a footnote in *Dechert LLP v. Commonwealth*, 606 Pa. 334, 998 A.2d 575 (2010), the footnote relates that the rule of strict construction does not require the strictest possible interpretation, and that it is applicable when the statutory text is uncertain. *See id.* at 348 n. 8, 998 A.2d at 584 n. 8. While these concepts seem uncontroversial as far as they go, I fail to see how they preclude application of Section 1928(b)(3) in the present case.

2. The principle was in force at the time of the *Bell III* decision. *See, e.g., In re Girard Trust Co.*, 343 Pa. 434, 435, 23 A.2d 454, 455 (1942); *Appeal of Wellsboro Hotel Co.*, 336 Pa. 171, 175, 7 A.2d 334, 335 (1939) (observing that the strict-construction rule for tax statutes was codified in the Statutory Construction Act of 1937).

legislative branch to enter the field and provide guidance; in the interim, however, I am constrained to concur with the majority's position that the judicial gloss set down in *Bell III* applies here. With that said, we should, at a minimum, construe *Bell III* strictly by not extending its rationale to items that are even less connected with actual "telephone messages transmitted" than those at issue in *Bell III*.

Given the above, I agree that the leasing of private, dedicated lines is sufficiently similar to the leasing of auxiliary lines at issue in *Bell III* (which were found to be taxable) so that the company's decision to charge customers via periodic lease payments rather than on a per-message basis is insufficient to remove them from the scope of the tax. *See Bell III*, 348 Pa. at 166, 34 A.2d at 533. As noted, however, I believe this result is based on a questionable reading of the term "messages transmitted," but one that is presently binding.

Finally, I depart from the majority's analysis with regard to non-recurring charges for telephone line installations, moves, and repairs. These actions do not involve the actual transmission of messages, nor do such services constitute "devices," "apparatuses," or "facilities," so as to bring them within the description endorsed by *Bell III*. The majority justifies application of the tax to such charges by observing that, absent the services involved, no messages would be transmitted at all. The majority suggests it follows that the services make the transmission of messages *"more* effective" or *"more* satisfactory" in the manner envisioned by the Court in *Bell III*. Majority Opinion, at 609–10, 127 A.3d at 764 (emphasis added). I find this reasoning untenable.

Notably, *Bell III* did not address one-time services designed to establish, repair, or move a component of the telephone network. The charges in *Bell III* were all for the *use* of various types of equipment involved in message transmission. To my mind, the majority's conclusion with regard to these nonrecurring charges represents a significant broadening of the scope of taxable items as compared to *Bell III*. Such broadening is not supportable by reference to the statutory text and it entails a misuse of the terminology employed in the

*Bell III* decision. Moreover, it runs directly contrary to the principle of strict construction relative to tax statutes. Accordingly, I respectfully dissent from this latter portion of the majority's holding.

Justice EAKIN, concurring and dissenting.

I agree with the Majority and the dissent of Chief Justice Saylor that *Commonwealth v. Bell Tel. Co.*, 348 Pa. 161, 34 A.2d 531 (1943) (*Bell III*), controls the outcome of the instant appeals. Verizon Telephone Company of Pennsylvania fails to present a compelling reason to set aside the doctrine of *stare decisis*. *See* Majority Op., at 597–602, 127 A.3d at 756–60. I further agree with the Majority's conclusion that, in light of *Bell III*, Verizon's gross receipts from the provision of private telephone lines [1] and directory assistance services are taxable under § 1101(a)(2) of the Tax Code, 72 P.S. § 8101(a)(2).[2] *See* Majority Op., at 602–07, 127 A.3d at 760–63. I dissent, however, from the Majority's expansive application of *Bell III* to Verizon's non-recurring service charges—*i.e.*, charges for the installation, repair, and relocation of telephone lines—and conclude these charges are not subject to the gross receipt tax imposed by § 1101(a)(2).

To be taxable under § 1101(a)(2), Verizon's gross receipts from non-recurring service charges must constitute revenue "received from . . . telephone messages transmitted[.]" *See* 72 P.S. § 8101(a)(2). In *Bell III*, this Court interpreted "tele-

---

1. In various portions of its opinion, the Majority refers to the revenue received by Verizon for the provision of private telephone lines as *installation* charges. *See, e.g., id.*, at 580, 127 A.3d at 746. However, these charges are for the *use and access* of private lines—not their installation, *see* Appellant's Brief, at 39 ("The revenue at issue from the provision of private lines related to fixed monthly charges paid by Verizon['s] customers for the exclusive and uninterrupted ability to *use* a dedicated telecommunications channel." (emphasis added)) (citing Stipulation of Facts, 11/21/12, at ¶¶ 33, 35), which affects my analysis below. Thus, I take exception with the Majority's phrasing.

2. Section 1101(a)(2) provides, in relevant part, "Every . . . telephone [corporation] . . . doing business in this Commonwealth . . . shall pay . . . a tax . . . upon each dollar of the gross receipts of the corporation . . . received from . . . *telephone messages transmitted* wholly within this State[.]" *Id.* (emphasis added).

phone messages transmitted" to include those services and apparatus that make the transmission of telephone messages more effective or satisfactory for customers. *Bell III*, at 532–33 (interpreting 72 P.S. § 2181 (repealed), which, like § 1101(a)(2), imposed tax on gross receipts received by telephone corporations for "telephone messages transmitted wholly within the State"). In reaching this interpretation, the Court examined the taxability of certain recurring usage charges,[3] focusing specifically on the purpose of the service or apparatus used. *Id.* The Court concluded, because the purpose of each service or apparatus was to render the transmission of an ongoing telephone message more effective or satisfying, the gross receipts received by the appellant for their usage were taxable. *Id.*

Here, however, the gross receipts at issue are distinguishable from those in *Bell III,* as the purpose of Verizon's nonrecurring service charges is not to make the transmission of telephone messages more effective or satisfying, but rather, to make the transmission *possible.* By installing, repairing, and relocating telephone lines, Verizon enables its customers to transmit messages—it does not improve the transmission of messages or a customer's experience through these services. Nevertheless, the Majority opines:

> [W]hen a customer pays Verizon a one-time fee for its installation of telephone lines, this unquestionably makes his or her ability to transmit telephone messages more effective, since, absent those lines, the making and receiving of telephone calls is impossible. Likewise, when a customer pays for repair services for telephone lines, this also has the result of making telephone service more effective, since ... the customer would not pay for such repairs unless he or she was experiencing difficulty transmitting messages through the telephone lines.
>
> [F]urther[,] ... [m]ovement of the customer's lines, or alteration of the customer's phone service to better suit the

---

**3.** The charges reviewed consisted of charges for the use of code calling systems and signal equipment, supplemental telephone equipment, and auxiliary telephone lines. *Id.,* at 532.

customer's needs and wishes, makes the customer's use of the telephone service more satisfactory, much like the installation of a telephone line in the first instance. Majority Op., at 609–10, 127 A.3d at 764. Yet, this rationale conflates the difference between making something more effective or satisfying, and making something possible. To say the transmission of telephone messages is more effective or more satisfying is to measure the degree of a customer's contentment with existing services or apparatus against his contentment with additional services or apparatus. Said another way, for the transmission of telephone messages to be more effective or satisfying, there must be a baseline that is increased by additional services or apparatus provided by the telephone company. Here, however, there is no baseline increased by Verizon's installation, repair, or relocation of telephone lines because these services simply make transmission of telephone messages possible, but do not improve it; these services *are* the baseline that *other* services and apparatus, such as those discussed in *Bell III*, make more effective or satisfying.

Two additional concerns regarding the Majority's rationale bear noting. First, the Majority suggests the repairing of telephone lines makes the transmission of messages more effective because, prior to repair, transmission is impossible. *Id.*, at 609–10, 127 A.3d at 764. However, I believe this reasoning broadens the *Bell III* standard far beyond the bounds intended by this Court, and may result in the taxation of nearly all "troubleshooting" services that make transmission possible if provided to customers at a charge. Second, the focus of the Majority's rationale regarding Verizon's relocation of customers' telephone lines is misplaced. As noted above, the *Bell III* Court centered its analysis on the purpose of the service or apparatus used. Here, however, the Majority ignores the purpose of the service provided by Verizon, *i.e.*, making the transmission of telephone messages possible, and instead focuses on the purpose of the customer's request for service, *i.e.*, "to better suit the customer's needs and wishes[.]" *Id.*, at 610, 127 A.3d at 764. While such a customer request would make the transmission of telephone messages more

satisfactory, that is not the purpose of the telephone company's provision of the service, which is the only focus of the *Bell III* standard. Thus, the Majority's rationale misapprehends *Bell III.*

Finally, I cannot conclude Verizon's non-recurring service charges are taxable under § 1101(a)(2) where no telephone message is actually transmitted as a direct result of the service provided. Unlike *Bell III,* where the services and apparatus at issue involved, at least in some part, the actual transmission of a telephone message, *see, e.g., Bell III,* at 532 (noting without code calling system or signal apparatus, customer away from his phone would not know of incoming call, but with equipment, he could be alerted of call, thus making actual transmission of telephone message more effective), Verizon's non-recurring service charges do not involve the transmission of a telephone message; thus, the instant case is further distinguishable from *Bell III.* On these bases, I dissent.