**[J-43-2019]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| CITY OF HARRISBURG, | : | No. 62 MAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 1982 CD |
| | : | 2015 dated May 10, 2018, Affirming |
| v. | : | the Order of the Dauphin County Court |
| | : | of Common Pleas, Civil Division, at |
| | : | No. 2015-CV-4163-MP dated |
| JOSHUA PRINCE, ESQ., | : | September 24, 2015 |
| | : | |
| Appellant | : | ARGUED: May 14, 2019 |

**OPINION**

**JUSTICE DONOHUE**                **DECIDED: November 12, 2019**

We granted allocatur to decide whether a spreadsheet created by the City of Harrisburg (the "City") to show the receipt of funds from donors (the "donor spreadsheet") to the Protect Harrisburg Legal Defense Fund (the "Fund") constitutes a financial record as defined in 65 P.S. § 67.102 of the Right-to-Know Law ("RTKL"), 65 P.S. §§ 67.101-67.3104.[1] *City of Harrisburg v. Prince*, 197 A.3d 1170 (Pa. 2018) (per curiam). As discussed herein, although records that would disclose the identity of individual donors are generally exempted from disclosure under the RTKL, if those records may be characterized as financial records, public access is statutorily required. Because we hold that the Commonwealth Court erred in concluding that the donor spreadsheet was not a

---

[1] Act of Feb. 14, 2008, P.L. 6.

financial record, we reverse.  However, in light of our decision in *Pennsylvania State Educ. Ass'n v. Commonwealth, Department of Community and Economic Development*, 148 A.3d 142 (Pa. 2016) ("*PSEA II*"), we hold that the case must be remanded for the performance of a balancing test to determine whether any of the donors' personal information may be protected from access under Article 1, Section 1 of the Pennsylvania Constitution.  Accordingly, we remand to the Commonwealth Court for further proceedings.

## I. Background

Under the RTKL, records in possession of a local agency are generally presumed to be public records, subject to certain exceptions.  65 P.S. § 67.305; *see also id*. § 67.102.[2]  Pursuant to section 701, "[u]nless otherwise provided by law, a public record, legislative record or financial record shall be accessible for inspection and duplication in accordance with this act."  *Id*. § 67.701.  However, if an agency determines that a record which is subject to access contains information that is not subject to access, the agency may redact the information that is not subject to access.  *Id*. § 67.706.

Additionally, certain exceptions (or exemptions) apply to the general rule that public records are subject to access.  *See id*. § 67.708(b).  Specifically, as relevant here, subsection 708(b) of the RTKL provides:

---

[2]  The section 305 "presumption shall not apply if: (1) the record is exempt under section 708; (2) the record is protected by a privilege; or (3) the record is exempt from disclosure under any other Federal or State law or regulation or judicial order or decree."  65 § 67.305 (internal footnote omitted).  Similarly, a "public record" is defined as "a record, including a financial record, of a Commonwealth or local agency that: (1) is not exempt under section 708; (2) is not exempt from being disclosed under any other Federal or State law or regulation or judicial order or decree; or (3) is not protected by a privilege."  *Id*. § 67.102 (internal footnote omitted).

**(b) Exceptions.--Except as provided in subsections (c)** and (d), the following are exempt from access by a requester under this act:

* * *

(13) **Records that would disclose the identity of an individual who lawfully makes a donation** to an agency unless the donation is intended for or restricted to providing remuneration or personal tangible benefit to a named public official or employee of the agency, including lists of potential donors compiled by an agency to pursue donations, donor profile information or personal identifying information relating to a donor.

65 P.S. § 67.708(b)(13) (emphasis added) (hereinafter, the "donor exception").[3]

Subsection 708(c), in turn, provides:

**(c) Financial records.--The exceptions set forth in subsection (b) shall not apply to financial records**, except that an agency may redact that portion of a financial record protected under subsection (b)(1), (2), (3), (4), (5), (6), (16) or (17). An agency shall not disclose the identity of an individual performing an undercover or covert law enforcement activity.

*Id.* § 67.708(c) (emphasis added).[4]

Thus, while records that would disclose the identities of individual donors are generally exempted from public access, *id.* § 67.708(b)(13), if those records may be categorized as "financial records," they are nonetheless subject to full disclosure (and may not be redacted), regardless of whether they would reveal the identities of individual donors, unless otherwise provided by law. *Id.* § 67.708(c). For this reason, whether a

---

[3] Subsection 708(b) sets forth thirty distinct exemptions or exceptions to disclosure, one of which is the donor exception. *Id.* § 67.708(b).

[4] Subsection 708(d) provides that "the exceptions set forth in subsection (b) shall not apply to aggregated data maintained or received by an agency, except for data protected under subsection (b)(1), (2), (3), (4) or (5)." *Id.* § 67.708(d).

given public record is a financial record is potentially outcome determinative in terms of the public's ability to access and inspect it.

As defined in section 102 of the RTKL, a financial record is:

> (1) Any account, voucher or contract dealing with:
>
>   (i) the receipt or disbursement of funds by an agency; or
>
>   (ii) an agency's acquisition, use or disposal of services, supplies, materials, equipment or property.
>
> (2) The salary or other payments or expenses paid to an officer or employee of an agency, including the name and title of the officer or employee.
>
> (3) A financial audit report. The term does not include work papers underlying an audit.

*Id.* § 67.102.

On February 25, 2015, Appellant Joshua Prince ("Prince") submitted a RTKL request to the City seeking records related to the Fund, which the City created to defray legal costs associated with defending challenges to local firearms ordinances. Prince's request sought the following:

> This is a request for all records, including, but not limited to, financial records pursuant to [s]ection 102, since January of 2015, relating to the *US Law Shield, et al. v. City of Harrisburg, et al.* and *Firearm Owners Against Crime, et al. v. City of Harrisburg, et al.* [cases] including, but not limited to the following: (1) All records, including, but not limited to, [the Fund]. ... As provided for by [s]ection 102, this specifically includes, but is not limited to, **the names, addresses, and amounts of any donations to/receipts by the City**; (2) All records, including, but not limited to, all financial accounts and financial institutions utilized by the [City] in relation to request (1); (3) All records, including, but not limited to, contracts, communications, and billings from or to Lavery, Faherty, Patterson or any other law firm or attorney hired to review the legal issues relating to request (1); and (4) Any other record in any way relating to the current litigation specified above.

*City of Harrisburg v. Prince*, 186 A.3d 544, 548 (Pa. Commw. 2018) (internal footnotes omitted).

On February 26, 2015, citing subsection 708(b)(13) of the RTKL, the City's records officer partially denied Prince's request and, as relevant here, provided Prince with a redacted donor list. It revealed the donation amounts and dates but redacted the names, addresses, check numbers and telephone numbers of the donors who contributed. Several days later, the City provided Prince with an updated redacted spreadsheet and also disclosed, by email, that it uses Citizen's Bank for the Fund account.[5]

Prince appealed to the Office of Open Records ("OOR"). In a letter dated March 12, 2015, the OOR responded by inviting the parties to submit additional information and legal argument within seven days. The OOR also advised the City that it must notify any third parties of their right to participate in the appeal and cautioned that a third party's failure to participate "may be construed as a waiver of objections regarding release of the requested records."[6]

---

[5] At this point, the total number of donations listed on the redacted spreadsheet was six. The total amount of donations was $750 and no single donation exceeded $250.

[6] Specifically, the OOR's letter provided:

> **Agency must Notify Third Parties**: If records affect a legal or security interest of an employee of the agency; contain confidential, proprietary or trademarked records of a person or business entity; or are held by a contractor or vendor, **the agency must notify such parties of this appeal immediately and provide proof of that notice to the OOR within 7 business days.** Such notice must be made by (1) providing a copy of all documents included with this letter; and (2) advising **that interested persons may request to participate in this appeal** (*see* 65 P.S. § 67.1101(c)).

On April 9, 2015, to more fully develop the record, the OOR requested specific additional information from the City about the Fund.[7] In response, the City's Solicitor, Neil Grover, explained that the Fund is (1) "a subaccount/line item of the Police Protection Special Revenue Fund (SPF) of the City"; (2) "all SPFs have their own bank account. All expenditures from this fund are line item appropriated by Council as per the normal budgeting process"; (3) "all revenues received for this SPF are donated directly to the City, deposited by Treasury (checks are written to 'City Treasurer') and accounted for in the City's General Ledger/accounting system"; and (4) all of the donors on the redacted spreadsheet are individuals, not corporations or other entities.

In response to the OOR directing the City to notify third parties of their right to participate in the appeal, and to Prince's demand for proof of such notification, the City again cited subsection 708(b)(13). The City urged that the notification requirement was inapplicable because donor information was exempt from disclosure and therefore properly redacted on the spreadsheet. In the alternative, the City argued that even if subsection 708(b)(13) somehow did not protect donor information on the spreadsheet from disclosure, third party notification was unnecessary because the donor spreadsheet was created by the City, not by a third party.[8]

---

Letter to Prince and City, 3/12/2015, at 1 (emphasis in original).

[7] Specifically, the OOR requested that the City supply answers to the following questions in the form of an affidavit: "(1) What is the Fund?; (2) Is the Fund a financial account of the City? A financial account of a third-party non-profit? A financial account of a third-party for profit?; (3) Are amounts donated to the City or a third party?; and (4) On the [redacted spreadsheet] provided, are the donors individuals, corporation, entities, etc.?"

[8] The City cited section 707 of the RTKL. That section requires an agency to notify "any third party that provided the record to the agency" as well as "the person that is the subject

In its final determination, the OOR concluded that because the City had failed to provide a sworn affidavit establishing subsection 708(b)(13)'s applicability, it had therefore failed to meet its burden of proof that the redacted information was exempt from disclosure.[9] Accordingly, the OOR directed the City to supply Prince with the unredacted donor spreadsheet within thirty days.

The City filed a petition for review appealing the OOR's final determination in the Dauphin County Court of Common Pleas and subsequently supplemented the record with a sworn affidavit from Solicitor Grover.[10] The trial court reversed the OOR's final order, concluding on the basis of this affidavit that the City had met its burden of proving that the redacted donor information was exempt from disclosure. Trial Court Opinion, 9/24/2015, at 2.[11]

Prince appealed to the Commonwealth Court. He argued that the trial court erred in reversing the OOR's determination that the names and addresses on the donor spreadsheet must be disclosed. Specifically, he urged that because the donor

---

of the record and the requestor" if the agency "produces a record that is not a public record, legislative record or financial record." 65 P.S. § 67.707.

[9] The OOR also concluded, based on an attestation submitted by Solicitor Grover, that the City had demonstrated that no other records responsive to Prince's request exist.

[10] In his sworn affidavit, Solicitor Grover indicated that the Fund was created to help the City pay legal expenses associated with challenges to local firearm ordinances and that donations to the Fund do not provide remuneration or personal tangible benefit to any public official or City employee. *See* Affidavit of Neil Grover, 7/14/2015, at 2 (tracking the language of subsection 708(b)(13)).

[11] Though not relevant to the instant appeal, Prince filed a cross-petition for review arguing that the OOR erred in concluding that the City had provided him with all responsive records. Noting that public officials are presumed to act lawfully, the trial court relied on Solicitor Grover's attestation to affirm the OOR's conclusion that no other responsive records exist. *Id.* at 3.

spreadsheet is "clearly an 'account' or 'voucher' that deals with the 'receipt … of funds by an agency'," it meets the definition of financial record in section 102 of the RTKL and, accordingly, is not protected from public access pursuant to subsection 708(c). *See Prince*, 186 A.3d at 553. The City, for its part, argued that section 706 of the RTKL permits redaction and that a broad reading of the definition of financial record would render the donor exception a nullity. *Id.* at 554.

En banc, the Commonwealth Court affirmed the decision of the trial court and held, as pertinent here, that the donor spreadsheet was not a financial record and could therefore be redacted to protect the names and addresses of donors to the Fund. Citing, inter alia, this Court's decision in *Department of Public Welfare v. Eiseman*, 125 A.3d 19, 29-30 (Pa. 2015) (indicating that records bearing a "sufficient connection" to accounts, vouchers or contracts may be "financial records"), the Commonwealth Court explained:

> The names and addresses in the Spreadsheet sought herein are not sufficiently connected to any City account, voucher, or contract to constitute a financial record subject to disclosure under the RTKL; rather the information in the Spreadsheet is merely a collation of data with respect to the donors of private funds that is subject to exemption. The private funds voluntarily donated to the City by check were not "received" by the City, and did not become agency funds for purposes of the RTKL, until they were deposited into a City account, and the City's internal compilation of private donor information does not have a sufficiently close connection to such account to be considered a financial record under the RTKL. In short, records relating to the actual receipt and disbursement of the privately donated nongovernmental funds by the City into and from a City account are "financial records" for purposes of the RTKL; documents unrelated to the foregoing financial transactions are not "financial records" and are subject to exemption. *See, e.g.*, *Tribune–Review Publishing Company v. Department of Community and Economic Development*, 580 Pa. 80, 859 A.2d 1261, 1268 (2004) ("Neither 'the log' nor the information it contains could be characterized fairly as an account, contract, or voucher to accompany or memorialize

funding. ... While the database does indicate whether certain applications have been awarded Program funding, it is simply an electronic storage facility, and not a decisional document.").

As a result, the trial court did not err in determining that the requested donor Spreadsheet information is exempt from disclosure under [s]ection 708(b)(13) of the RTKL.

*Prince*, 186 A.3d at 555–56 (internal footnotes omitted).

Judge Cohn Jubelirer dissented in an opinion joined by Judge McCullough. The dissent criticized the majority's narrow construction of the meaning of financial record, emphasizing that this Court has broadly construed the term in light of the General Assembly's intent to expand transparency and access through the RTKL. Specifically, the dissent stated that "there is no doubt that the funds here are received by the City" or that the donor spreadsheet "evidences the receipt of funds by the City from donors, which, in turn, are deposited by the City Treasury into a City bank account." *Id*. at 565 (Cohn Jubelirer, J., dissenting). Moreover, the dissent observed that donations to the Fund are accounted for in the City's accounting system and appropriated by City Council to pay legal fees. Concluding that the donor spreadsheet is therefore a financial record subject to disclosure, the dissent further noted its view that the donor exception in subsection 708(b)(13) does not preclude release of the donor information because it is not an exception that applies to financial records. *Id*. Finally, the dissent stated that it would remand to the trial court to apply the balancing test established by this Court in *PSEA II*

to determine whether the donors' constitutional right to privacy protects the information, even though the statute does not.[12]

## II. Discussion

We must determine whether the donor spreadsheet is a financial record per the definition of that term in section 67.102 of the RTKL. This presents a question of law which we resolve de novo. As with all matters of statutory interpretation, we are guided by the rules of statutory construction which instruct that our primary goal is to ascertain the General Assembly's intent in enacting the statute. 1 Pa.C.S. § 1921.

Where the words of a statute are clear and unambiguous, they are presumed to be the best indication of legislative intent. *Id.* § 1921(b). If the words of a statute are not explicit, however, we may consider various factors in ascertaining the General Assembly's intention, including, inter alia, the object to be obtained, the former law, and the consequences of a particular interpretation. *Id.* § 1921(c). To this end, we are obliged to liberally construe the statute "to effect [its] object and promote justice." *Id.* § 1928(c).

---

[12] The Majority reasoned that even if the donor spreadsheet is a financial record, subsection 708(b)(6), which contains an exception to disclosure for certain "personal financial information" and is preserved by subsection 708(c), nonetheless authorizes redaction. *Prince*, 186 A.3d at 556. Subsection 708(b)(6) provides, in relevant part, that "the following personal identification information: … A record containing all or part of a person's … 'personal financial information' and home, cellular or personal telephone numbers …" is exempt from disclosure. 65 P.S. § 67.708(b)(6)(i)(A). Section 102 defines "personal financial information" as including "an individual's personal credit, charge or debit card information; bank account information; bank, credit or financial statements; account or PIN numbers **and other information relating to an individual's personal finances**." *Id.* § 67.102 (emphasis added). According to the Majority, the donors' names, addresses and phone numbers comprise such "personal financial information." The Majority affirmed the trial court on this alternative basis. The Dissent observed that the donors' names, addresses and phone numbers are not "coupled with" any sensitive or private information, and cannot fairly be characterized as "personal financial information" subject to redaction under the RTKL. *Prince*, 186 A.3d at 566 (Cohn Jubelirer, J., dissenting).

Moreover, guided by the presumption that the General Assembly intends the entire statute to be effective, we must read statutory provisions in context, construing various sections in conjunction with and by reference to one another. *Id.* § 1922(2). Unless the statute expressly indicates that one section nullifies another, we must not interpret it in such a manner. *Id.*; *see Kegerise v. Delgrande*, 183 A.3d 997, 1006 (Pa. 2018). Finally, once this Court has interpreted certain statutory language, we presume that the General Assembly intended the same language in a later, similar statute to have the meaning we previously gave it. *See id.* § 1922(4); *see also Verizon Pa., Inc. v. Commonwealth*, 127 A.3d 745, 757 (Pa. 2015).

As pertinent to this case, a financial record is "[a]ny account, voucher or contract dealing with … the receipt … of funds by an agency." 67 P.S. § 67.102. Thus, whether the donor spreadsheet is a financial record depends upon whether it is an "account" or "voucher" and whether it deals with the receipt of funds by an agency.[13] The terms "account" and "voucher" are not statutorily defined. On appeal to this Court, the parties focus primarily on whether the donor spreadsheet is an account, and advance different definitions of the word. They also disagree as to whether the donor spreadsheet deals with the receipt of funds by the City. Although these items are interrelated, for the sake of clarity, we take them up in turn.

Prince argues that an "account" is "a record of debit and credit entries" or "a record or statement of financial expenditure or receipts relating to a particular period or purpose." Prince's Brief at 15-16 (quoting various dictionary definitions). He highlights this Court's statement in *Pennsylvania State University v. State Employees' Retirement Board*, 935

---

[13] There is no contention that the donor spreadsheet is "contract."

A.2d 530 (Pa. 2007) ("*Penn State*"), that "the word 'account' can be properly defined in its ordinary sense to denote, inter alia, a list or enumeration of financial transactions." *Penn State*, 935 A.2d at 535 (discussing the Right to Know Act ("RTKA")[14] and observing that the term "'account' is to be broadly construed for the benefit of the public, encompassing, at minimum, the Commonwealth's financial records of debit and credit entries, as well as monetary receipts and disbursements"). In the alternative, he posits that the donor spreadsheet could be classified as a "voucher" based on the commonly accepted definition of that term as a "receipt" or "documentary record of a business transaction." Prince's Brief at 17.

Prince also argues that under the former RTKA, "the accounts/vouchers/contracts category of public records reaches some range of records beyond those which on their face constitute actual accounts, vouchers or contracts." *Id*. at 11-12 (citing *North Hills News Record v. Town of McCandless*, 722 A.2d 1037, 1039 (Pa. 1999)). He recognizes, however, that they must nonetheless bear a "sufficient connection to fiscally related accounts, vouchers or contracts." *Id*.[15] In this regard, Prince urges that the donor spreadsheet is directly connected to a fiscally related account because it documents the receipt of money into the Fund.

The City concedes, citing yet another dictionary definition of "account," that the term as commonly used may refer to "money deposited in a bank account and subject to

---

[14] Act of June 21, 1957, P.L. 390, formerly 65 P.S. §§ 66.1-66.9, repealed by Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

[15] Prince erroneously indicates that this language derives from a Commonwealth Court decision. In *North Hills News*, this Court invoked its extraordinary jurisdiction to decide the question presented. *Id*. at 1038.

withdrawal by the depositor." *Id.* at 5 (rejecting Prince's proposed definition of account as "more commonly associated with the word 'accounting'," which the legislature did not choose to employ). Without explanation or citation, however, the City promptly disregards even this meaning of account, urging that the General Assembly undoubtedly intended the term to refer to "municipal accounts set up with banks and other corporations for goods and services." *Id.* In the City's view, the donor spreadsheet fails to satisfy this definition.

The City also appears to concede that a receipt given to a donor recognizing her contribution to the Fund might fall within the definition of financial record, but the City does not view the donor spreadsheet as a receipt. *See* City's Brief at 6 (arguing that "the donor [spreadsheet] is obviously not a receipt. [It] was for internal use by the government officials, not given to the donors as a receipt for their contribution"). Moreover, the City argues that we are not bound by our broad interpretation of identical language under the RTKA because we did not, under the earlier law, have to reconcile our interpretation with the current statute's list of thirty exemptions including, in particular, the donor exception. City's Brief at 12-17. According to the City, we should not adopt the "sufficient connection" standard developed in our RTKA cases or find that such a standard is satisfied here. *Id.* at 17-21. Specifically, the City urges that we cannot conclude that the donor spreadsheet is a financial record because doing so will read the donor exception out of existence, in violation of our rules of construction. *Id.* at 12.[16]

---

[16] The American Civil Liberties Union of Pennsylvania (the "ACLU") filed an amicus brief in support of Prince. ACLU focuses its argument initially on the RTKL's purpose to expand access to information about government activity. ACLU's Amicus Brief at 4. The ACLU further notes that courts must liberally construe the RTKL to effectuate this

As the parties' arguments demonstrate, the relevant statutory terms are capable of multiple reasonable interpretations. Therefore, we conclude that the terms are ambiguous and, to ascertain what the General Assembly intended them to mean, we resort to our rules of construction. *See* 1 Pa.C.S. § 1921(c). The General Assembly enacted the RTKL in 2009 for the purpose of providing "access to official government information in order to prohibit secrets, scrutinize actions of public officials, and make public officials accountable for their actions." *Commonwealth, Dep't of Pub. Welfare v. Eiseman*, 125 A.3d 19, 29 (Pa. 2015) (citing *Levy v. Senate of Pa.*, 65 A.3d 361, 367 (Pa. 2013)). Although we have explained that the RTKL represented a "dramatic expansion" in public access to government documents as compared to the RTKA, we have also observed that the General Assembly reposited verbatim certain statutory language from the old law into the new law. *Id.*

---

purpose. After reviewing various decisions by this Court, discussed in more detail herein, the ACLU concludes that there is no question the donor spreadsheet is a financial record. Because it "documents a particular subset of funds given to the City, which the City deposited into its bank account," it bears a "sufficient connection" to a City account. *Id.* at 5.

The ACLU also observes that the Commonwealth Court narrowed the definition of financial record in ways that are not supported by the law. *See id.* at 7 (criticizing the Commonwealth Court's argument that the funds were not "'received' by the City, and did not become agency funds for purposes of the RTKL, until they were deposited into a City bank account"). The ACLU urges that nothing could be more closely connected to the Fund's account, other than the City's general ledger, than a spreadsheet reflecting donations deposited into the Fund. *Id.*

Finally, highlighting the broader implications of this case, the ACLU notes that the Commonwealth Court's overly narrow definition of financial record has the potential to undermine the public's ability to scrutinize the financial activities of judicial agencies, in particular, because financial records are the only records judicial agencies are required to disclose under the RTKL. *Id.* at 11 (citing 65 P.S. § 67.304).

As relevant to the present case, under the RTKA, a "public record" was defined, in pertinent part, as "any account, voucher or contract dealing with the receipt or disbursement of funds by an agency … ." 65 P.S. § 66.1.[17] We presume, therefore, that the General Assembly intended this same language in the RTKL, albeit situated now within the definition of "financial record," to have the same meaning we gave it under the RTKA. *See* 1 Pa.C.S. § 1922(4); *see Eiseman*, 125 A.3d at 29. As discussed in more detail herein, that meaning is a broad one, encompassing not merely accounts, vouchers and contracts but also records bearing a sufficiently close connection to such "fiscally related" categories, so long as they also "deal with the receipt or disbursement of funds

---

[17] The full definition of "public record" under the RTKA was:

> **Any account, voucher or contract dealing with the receipt or disbursement of funds by an agency** or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons: Provided, That the term "public records" shall not mean any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of its official duties, except those reports filed by agencies pertaining to safety and health in industrial plants; it shall not include any record, document, material, exhibit, pleading, report, memorandum or other paper, access to or the publication of which is prohibited, restricted or forbidden by statute law or order or decree of court, or which would operate to the prejudice or impairment of a person's reputation or personal security, or which would result in the loss by the Commonwealth or any of its political subdivisions or commissions or State or municipal authorities of Federal funds, excepting therefrom however the record of any conviction for any criminal act.

65 P.S. § 66.1 (emphasis added).

by an agency." *LaValle v. Office of Gen. Counsel,* 769 A.2d 449, 456 (Pa. 2001), *North Hills News,* 722 A.2d at 1039

Under the RTKA, we discussed the "accounts, vouchers or contracts" language on multiple occasions. *See e.g., Sapp Roofing Co., Inc. v. Sheet Metal Workers' Int'l Ass'n*, 713 A.2d 627, 629 (Pa. 1998) (plurality); *North Hills News*, 722 A.2d at 1039; *LaValle,* 769 A.2d at 456; *Tribune-Review Publ'g Co. v. Dep't of Cmty. & Econ. Dev*, 859 A.2d 1261, 1268 (Pa. 2004); *Penn State*, 935 A.2d at 535. Therefore, we proceed with a review of these cases.

In *Sapp Roofing*, we addressed the application of this definitional category to determine whether a labor union should be given access under the RTKA to certain of Sapp Roofing's payroll records. *Sapp Roofing*, 713 A.2d at 628. The requested records were in the possession of a school district that had contracted with Sapp Roofing, a non-union company. More specifically, pursuant to the Prevailing Wage Act, the school district had, according to the opinion announcing the judgment of the court, been required to obtain these records before making a final payment on its contract. A majority of this Court – three of the five justices participating – determined that the payroll records were "public records" for purposes of the RTKA "because they are records evidencing a disbursement by the school district." *Sapp Roofing*, 713 A.2d at 629 (Castille, J., joined by Flaherty, J. with Nigro, J. concurring in result); *see also id.* at 630-31 (Zappala, J., concurring) (writing separately only to note his view that the Prevailing Wage Act does not appear to **require** a private contractor to submit payroll records to the public agency view); *but see id.* at 631 (Cappy, J., dissenting) (expressing the view that because the payroll records were "neither a record of any business dealings or transactions between

[Sapp Roofing] and the [s]chool [d]istrict," they are not a "voucher" or an "account," and are certainly not evidence of a "contract").[18]

A year later, in *North Hills News*, we addressed whether an audio recording of a telephone call to an emergency response center was a public record that must be made accessible under the RTKA. There, we explained that public records included two definitional categories, the first of which "deals generally with fiscal aspects of governance, providing for public review of accounts, vouchers or contracts 'dealing with' receipts and disbursements by an agency." *North Hills News*, 722 A.2d at 1038. Although this category of records was not actually at issue in *North Hills News*, we nonetheless observed that it was "implicit in … *Sapp Roofing* … that the accounts/vouchers/contracts category of public records" was meant to encompass "some range of records beyond those which on their face constitute actual accounts, vouchers or contracts." *Id.* at 1039. However, we also noted that *Sapp Roofing* makes clear "that, to constitute a public record, the material at issue must bear a sufficient connection to fiscally related accounts, vouchers or contracts." *Id.* (contrasting the breadth of this category of records, which must merely "**deal[] with** government receipts and expenditures" with the "somewhat narrower construct" the General Assembly selected for the "minutes/orders/decisions

---

[18] There was a separate question in *Sapp Roofing* regarding whether the payroll records were in fact records of "public agencies," given that they originated with the private contractor. In analyzing that question, the OAJC explained that records are "of an agency" if they "constitute an essential component of an agency decision." *Id.* at 629. Because of the mandates of the Prevailing Wage Act, two of the three participating justices concluded that the payroll records were an essential component of the school district's decision about whether and how much to pay Sapp Roofing, and therefore met the requirement that records of a "public agency" be accessible under the RTKA. *Id.*

category" at issue in *North Hills News*, which must "fix" rights and duties) (emphasis added).

Subsequently, in *LaValle*, we elaborated upon the breadth of the "account, voucher or contract" category of public records discussed in *Sapp Roofing* and *North Hills News*. The record at issue in *LaValle* was a report prepared for PennDOT by an accounting consultant, Ernst & Young, in connection with litigation against the Commonwealth. In analyzing whether the report was a public record subject to access, we corrected the Commonwealth Court's misunderstanding that a document "must contain information essential to the performance of a mandatory, statutory duty in order to qualify as a public record" under the RTKA. *LaValle*, 769 A.2d at 454 (observing that the lead opinion in *Sapp Roofing* considered the "essential" nature of the payroll records only in discussing whether they were records "of an agency"); *see also supra* note 16. We concluded further that the RTKA "simply does not distinguish between mandatory and discretionary governmental duties in prescribing the right of access of public records." *LaValle*, 769 A.2d at 455.

More to the point, we reiterated that the RTKA "reaches some class of materials that are not facially accounts, vouchers, contracts, minutes, orders or decisions." *Id*. at 456. Referring to this "expanded class" of records, we noted that there is a "general constraint" upon it insomuch as there must be "some close connection between one of the statutory categories and the material sought." *Id*. We emphasized that because the General Assembly intended for the RTKA to be liberally construed "to fully implement the policy of disclosure," the requirement of a "close connection" between the document requested and one of the statutory categories was apt. *Id*. It effectively implements the

purpose behind the law while also adhering to the "definitional limits prescribed by the legislature." *Id.*[19]

Next, in *Tribune-Review*, we considered whether the RTKA required the Department of Community and Economic Development ("DCED") to disclose records related to unfunded grant applications for the financing of community improvement projects. *Tribune-Review*, 859 A.2d at 1264.  Specifically, the question was whether a database tracking report, called the "log", was a "public record."  Again discussing the definitional categories of "public record," we indicated that the "account, voucher or contract" category requires public access "only of … writings that accompany or memorialize funding," concluding in a fairly cursory manner that the "log" could not be said to satisfy this definition.  *Id.* at 1269.  The Majority also concluded that it did not satisfy the "minute, order or decision" category because it was not a "decisional document."  The Majority further observed that because the "log" was "merely a collation of data provided by … applicants," and was not rendered a "public record simply because the agency under[took] the secretarial task of inputting data."  *Id.* at 1268.

---

[19] Ultimately, in *LaValle*, we did not decide whether the Ernst & Young report fell within this "expanded class" because we concluded that it might nonetheless be protected from public disclosure if it were shown to "constitute[] work product, or otherwise reflect[] predecisional deliberative aspects of PennDOT's or its representatives' decision making processes."  *Id.* at 458.  Although we did not adopt a "deliberative process privilege," we expressly relied upon policies that inform that privilege and those underlying the work product doctrine in construing the RTKA.  Accordingly, we held the RTKA's definition of public records "does not apply to materials or portions thereof which reflect" deliberative aspects of agency decision-making.  *Id.*  Because under the RTKA, the burden was on the requestor to demonstrate that the requested document met the definition of "public record," and because the requestor in that case failed to dispute the Office of General Counsel's position that the report was made up entirely of its representative's mental impressions, we declined to authorize access to the report.  *Id.* at 459.

Finally, the Majority noted that "documents containing confidential deliberations of law and policymaking, reflecting opinions, recommendations or advice" of the government agency "are simply not public records subject to disclosure" under the RTKA. *Id.* at 1269 (construing the meaning of "public record" by reference to the policy rationale underlying a "deliberative process" privilege but once again declining to adopt the privilege). Without expressly holding that the "log" in fact contained confidential deliberations, the Majority affirmed the Commonwealth Court's refusal to grant access to the document "for the foregoing reasons." *Id.* Now Chief Justice Saylor, joined by Justices Castille and Nigro, dissented. The dissent would have found that the "log" met the definition of "public record" because it bore a "sufficiently close" nexus to a statutory category. *Id.* at 1270 (Saylor, J., dissenting).

Three years later, in *Penn State*, we distinguished the facts of *Tribune-Review* in favor of finding that information about the service histories and salaries of various Penn State employees constituted public records of the State Employees' Retirement System and was therefore subject to disclosure under the RTKA. *See Penn State*, 935 A.2d at 536. In reaching this conclusion, we reiterated our statement from *LaValle* that "the RTKA reaches materials that are not facially accounts, vouchers, or contracts, but nonetheless bear some close connection with one or more of these statutory categories." *Id.* at 534. We also blessed various decisions by the Commonwealth Court construing the term "account" broadly to encompass, inter alia, "at minimum, the Commonwealth's financial records of debit and credit entries, as well as monetary receipts and disbursements." *Id.* at 534-35 (collecting cases).

Recognizing that the word "account" has "multiple acceptable definitions," among them being "a list or enumeration of financial transactions," we concluded that the requested information about employee salaries and service histories was subject to disclosure because it was "detailed and evidenced in the form of records which … fit the definition of 'account, voucher or contract'." *Id*. at 535. Moreover, because that information provided the basis to calculate the employees' vested retirement benefits, to which they were contractually entitled, it also "deal[t] with the receipt or disbursement of funds by an agency." *Id*. It was in this respect that we distinguished *Tribune-Review*, observing that because "no funds were received, distributed or guaranteed by the agency" in that case, "the information requested did not pertain to such receipt, distribution or guarantee." *Id*.

Following the passage of the RTKL, we first addressed the definition of "financial record" in *Eiseman*. *Eiseman*, 125 A.3d at 29-30. The dispute in *Eiseman* was whether documents in the possession of the Department of Public Welfare (the "DPW") – reflecting rates paid by private managed care organizations ("MCOs") to dental subcontractors, pursuant to contracts the DPW had with these MCOs for the provision of dental services to Medicaid recipients in the state – were contracts that "deal[t] with the … disbursement of funds by an agency." *Id*. Explaining by reference to *North Hills News* that "account, voucher or contract" encompasses records that "'bear a sufficient connection' to such fiscally-related categories," we clarified that for a record to **deal with** the disbursement of funds by an agency it need not directly "show" a disbursement by the agency. *Id*. at 28. Thus, the records reflecting rates paid by MCOs to subcontractors were "financial

records" because they were sufficiently connected to contracts that channeled funds from the DPW to the MCOs' subcontractors.

For the reasons developed in our cases under the RTKA, and because the current statutory scheme does not demand otherwise, we will continue to construe the "account, voucher or contract" category broadly under the RTKL to effectuate expanded access to information about the activities of government. *See* 1 Pa.S.C. §§ 1921, 1922. Thus, we need not settle on a single definition of "account." Rather, we conclude, as we did in *Penn State*, that the term has multiple acceptable definitions, including "a list or enumeration of financial transactions" and a "record of debit and credit entries, as well as monetary receipts and disbursements." *Id.*

Moreover, consistent with our cases, to satisfy the statutory definition of financial record, the donor spreadsheet need only bear a close connection to an account. We find that it does. The donor spreadsheet reflects a list of monetary receipts, i.e., donations, to the City. Specifically, it contains an enumeration of check amounts received by the City for the Fund, which the City's Solicitor described as a "subaccount/line item" of an SPF which has its own bank account and for which "all revenues received," including the donations at issue here, are reflected in the City's general ledger. *See supra* at p.6. The donor spreadsheet is an "account, voucher or contract dealing with … the receipt … of funds by an agency." 67 P.S. § 67.102.

We are unpersuaded by the City's attempt to characterize the donor spreadsheet as akin to the "log" in *Tribune-Review*, which we concluded was not sufficiently connected to an account, voucher or contract. Unlike the "log" in *Tribune-Review* that bore a connection to **unfunded** grant applications and which did not resemble an account in its

own right, the donor spreadsheet comprises a list of funds actually received by the City. *See Tribune-Review,* 859 A.2d at 1269; *see also Penn State*, 935 A.2d at 535. Thus, it both satisfies a commonly used definition of "account" and is directly connected to the Fund's bank account in that it reflects the amounts of money deposited therein. Moreover, whereas the "log" arguably reflected confidential deliberations, *Tribune-Review*, 859 A.2d at 1269, the donor spreadsheet does not.

Similarly, we reject the City's argument that the donor spreadsheet is not a financial record because it is neither a "decisional document" nor an "'essential component' to the [City's] bank account." City's Brief at 20-21 (citing *Tribune-Review*, 859 A.2d at 1268 and *Sapp Roofing*, 713 A.2d at 629, respectively). Whether the City **needed** the donor spreadsheet in order to deposit or use the donations does not bear on whether the document is "sufficiently connected" to an account. *See LaValle*, 769 A.2d at 455 (noting that the RTKA "does not distinguish between mandatory and discretionary governmental duties in prescribing the right of access of public records"). Moreover, this Court has not held that a record must be "decisional" in nature in order to meet the definition of "account, voucher or contract." *See Tribune-Review*, 859 A.2d at 1268 (employing the term "decisional document" only to characterize the "minutes, orders or decision" definitional category of "public record" in the RTKA).

Furthermore, we perceive no basis in the statute or in our cases for the Commonwealth Court's position, espoused by the City, that "the private funds voluntarily donated to the City by check were not 'received' by the City, and did not become agency funds for purposes of the RTKL until they were deposited into a City account." *Prince*, 186 A.3d at 555. **When** the donor spreadsheet was created relative to **when** the

donations were deposited into the City's coffers is neither apparent in the record nor dispositive on the question of whether the spreadsheet deals with funds that were "received" by the City. The City concedes that the donations reflected in the spreadsheet were in fact deposited into a City account for use by the City. The checks were made out to the City Treasurer. We find it unconvincing, in light of this fact, to suggest that those funds were not "received." Such a temporal distinction places form over function in a way that is entirely inconsistent with our liberal construction of the statutory language and with the overarching purpose of the RTKL.

Based on our conclusion that the donor spreadsheet is a financial record as defined in section 102, we hold that the donor exception to disclosure does not apply to it. *See* 65 P.S. § 67.708(b)(13); *id.* § 67.708(c) (providing that "the exceptions set forth in subsection (b) shall not apply to financial records"). We further hold that subsection 708(c) does not authorize the City to redact "information that would disclose the identity" of the donors because the donor exception, subsection 708(b)(13), is not included in the short list of financial records that may be redacted. *See id.* § 67.708(c) (providing that "an agency may redact that portion of a financial record protected under subsection (b)(1), (2), (3), (4), (5), (6), (16) or (17)").

Our broad interpretation of the term financial record does not, contrary to the City's position, swallow the donor exception whole in violation of our rules of statutory construction. *See* City's Brief at 8-10 (citing 1 Pa.C.S. § 1921(a)).[20] The City's position

---

[20] Nor do we perceive a risk that the other exceptions to disclosure set forth in the RTKL will be swallowed whole under our interpretation of "financial record." *See id.* at 15 (suggesting that Prince's definition of financial record would eliminate the individual privacy protections enshrined in subsections 708(b)(7), (11), (12), (13), (15) and (28)).

is premised upon an incorrect assumption, namely that because all records containing donor information deal with the receipt of funds, they are all financial records. *Id.* We emphasize that our interpretation of financial record requires that a record **both** bear a "sufficient connection" to a financial "account, voucher or contract" **and** "deal with the receipt or disbursement of funds by an agency." 65 P.S. § 67.102.

While it may be difficult to envision a document that contains donor information but is not a financial record, it is certainly not impossible to do so. In fact, in the donor exception itself, the General Assembly set forth three specific examples of donor records that would appear capable of saving the donor exception from nullification under our interpretation of financial record. *See* 65 P.S. § 67.708(b)(13). Specifically, "lists of potential donors compiled by an agency to pursue donations", "donor profile information" and "personal identifying information relating to a donor" could all remain exempt from disclosure, so long as they did not also bear a "sufficient connection" to an "account, voucher or contract dealing with the receipt or disbursement of funds by an agency." *See id.* While we decline to draw a bright line demarcating where the "sufficient connection" begins and ends, we observe that the City's inclusion of donation amounts and check numbers on the donor spreadsheet in this case brings the document within the statutory definition of financial record.

The General Assembly enacted the RTKL with the intent of increasing access to public records. The fact that it simultaneously set forth a list of records, including certain donor records, that would be exempt from disclosure, 65 P.S. § 67.708(b), does not require the conclusion advocated by the City, namely that the exemption necessarily applies to this donor record. What the City fails to appreciate is that the General Assembly

also simultaneously enacted subsection 708(c). Subject to only a few exceptions not at issue here, subsection (c) makes plain that the General Assembly sought to ensure the disclosure of financial records, including some donor records, even if those records would be exempt from disclosure if they were not financial in nature. 65 P.S. § 67.708(c); *see Eiseman*, 125 A.3d at 32 (discussing the "internal trade-secrets/confidential proprietary information" exception in subsection 708(b) and observing that "it is essentially undisputed that [subs]ection 708(c) renders [that exemption] inapplicable" to financial records).[21]

Even though we conclude that the donor spreadsheet is a financial record which cannot be redacted pursuant to subsection 708(c), a question remains as to whether any redactions are required in light of our recent decision in *PSEA II*. In that case, we considered whether school districts were required to disclose the home addresses of public school employees in responding to a RTKL request. *See PSEA II*, 148 A.3d at 143. After concluding that certain personal information, including home addresses, implicates the right to privacy under Article 1, Section 1 of the Pennsylvania Constitution,

---

[21] The City also urges us to adopt the Commonwealth Court's alternative rationale for allowing redaction, namely that the names and addresses of donors comprise "personal financial information" pursuant to subsection 708(b)(6)(i)(A) and section 102, which defines this term. *See* City's Brief at 21*; see supra* n.12. We decline to do so. As the Dissent below explained, the definition of "personal financial information" includes specific items relating to private, sensitive financial information, such as credit card information and PIN numbers. *Prince*, 186 A.3d at 566 (Cohn Jubelirer, J., dissenting); *see* 65 § 67.102. Although the definition also includes "other information relating to an individual's personal finances," 65 § 67.102, our rules of statutory construction require us to interpret that more general phrase by reference to the preceding specific examples. *See Dep't of Envtl. Prot. v. Cumberland Coal Res., LP*, 102 A.3d 962, 976 (Pa. 2014) (describing the doctrine of ejusdem generis). Because names and addresses are not sensitive pieces of personal financial information like the enumerated items, and because the donor spreadsheet contains no other such information, we will not apply this exception to allow the City to redact donor names and addresses. *See* Prince's Brief at 21-22.

we determined that a court must engage in a balancing test where such information is requested. *Id.* at 157. Specifically, the privacy interests of those individuals whose personal information would be disclosed must be weighed against the public's interest in disclosure. *Id.* at 157-58.

In *PSEA II*, we observed that public school employees have strong privacy interests in their home addresses and do not forfeit these interests simply because they have agreed to be employed by the school district. *Id.* at 158. We also observed that there would be little benefit to the public from a disclosure of "bulk" personal information in response to "generic requests based upon no criteria other than [the employees'] occupation." *Id.*

The City argues that *PSEA II* simply prevents the disclosure of names and addresses on the donor spreadsheet. City's Brief at 22-25. Balancing the public interest against an individual donor's constitutional right to privacy, the City concludes that a donor's right to privacy in her name and address outweighs Prince's interest in access to the unredacted donor spreadsheet, for which he has no "lofty, newsgathering" goal. In this regard, the City characterizes Prince's desire for access as "openly malicious," indicating that Prince intends to use the information to harass the donors for supporting the City's defense of its gun control ordinance which he believes is preempted and therefore criminal. *Id.* at 25-26 (noting specifically that Prince has said that donors to the Fund "aid the City in engaging in conduct that constitutes a crime").

Prince counters that the public interest in access to the names and addresses outweighs the donors' privacy rights because the public should be privy to information about who is funding government action. Prince's Reply Brief at 13; *see also* ACLU's

Amicus Brief at 8 (specifically urging that the public has a right to know whether groups like the National Rifle Association or Everytown for Gun Safety are funding government action). Moreover, in Prince's view, the donors relinquished their privacy interests when they "availed themselves of a public forum," by sending checks to the City. Prince's Reply Brief at 13.

The record in this case indicates that the donors themselves were never notified about their right to object to the disclosure of their names and addresses. *See supra* at pp. 6-7. [22] Before the City can perform the required balancing test, *see Reese v. Pennsylvanians for Union Reform*, 173 A.3d 1143, 1159 (Pa. 2017) (holding that the agency disseminating the requested information must perform the *PSEA II* balancing test,

---

[22] In *PSEA II*, we expressed our "concerns regarding the disjointed and scant procedural protections at both the request and appeal stages" with regard to third party notice and opportunity to be heard. *PSEA II*, 148 A.2d at 159-60. We also noted that our concerns were not new, as we had alerted the OOR as early as 2012 that the RTKL, as implemented by the OOR, lacked adequate administrative and judicial processes for ensuring that third parties can "seek redress for action that they believe violates the statutory scheme and/or their constitutional rights." *Pa. State Edu. Ass'n ex rel. Wilson v. Com., Dep't of Cmty. & Econ. Dev.*, 50 A.3d 1263, 1275–76 (Pa. 2012) (*"PSEA I"*); *see also id.* at 1279 (Castille, J., concurring) (observing that "the OOR may be in the best position to devise an adequate procedure governing all appeals to the OOR that complies with and promotes uniformity in the OOR's administration of the [RTKL]"). Here, again, we have reason to repeat ourselves.

Despite our repeated alerts to these due process deficiencies, neither the General Assembly nor the OOR has implemented improved procedural protections for individuals whose personal information may be subject to disclosure in violation of their constitutional right to privacy. Indeed, the OOR's March 2015 letter to the City in the case sub judice did not account for the due process rights of the donors at all. *See supra* at note 6 (providing for third party notification only if the records at issue "affect a legal or security interest of an employee of the agency; contain confidential, proprietary or trademarked records of a person or business entity; or are held by a contractor or vendor"). Because sufficient procedural protections remain elusive, the nature and extent of these, including a method for protecting the donors' personal information should they choose to object to its disclosure, will have to be determined on remand.

unless legislative pronouncements or prior decisions of this or other Pennsylvania courts have already done so), the donors must be afforded notice and an opportunity to be heard.

Accordingly, the case is remanded to the Commonwealth Court for further proceedings consistent with this decision.

Chief Justice Saylor and Justices Baer, Todd, Dougherty, Wecht and Mundy join the opinion.